DAVID LEAVITT, Receiver, *v.* RICHARD M. BLATCHFORD et al.

Associations organized under the act to authorize the business of banking are not subject to the "regulations to prevent the insolvency of moneyed corporations" ( 1 *R. S.*, 588 ), except so far as they have been incorporated in the general banking law of 1838 or expressly applied by subsequent statutes.

Instruments issued by a banking association, in the form of bonds for the payment of a principal sum at a future day, convertible at the holder's option into stock of the association, with coupon warrants attached for semi-annual payments of interest, the bonds, so called, not being sealed instruments under the law of this state, are not, nor are the coupons, bills or notes within the prohibition of the statute ( *ch.* 363 *of* 1840, § 4 ) against the issue of bills or notes not payable on demand and without interest.

Sundry propositions, established in *Curtis* v. *Leavitt* ( 15 *N. Y.*, 9 ), adopted and applied to the case of a preferential assignment of property of the association to secure an existing debt upon an extension of the time of payment.

*Gillet* v. *Moody* ( 3 *Comst.*, 479 ), *Talmage* v. *Pell* ( 3 *Seld.*, 328 ), and *Gillet* v. *Phillips* ( 3 *Kern.*, 114 ) reviewed and in part overruled.

APPEAL from the Supreme Court. The action was commenced May 6, 1843, in the late Court of Chancery, by David Leavitt, receiver of the North American Trust and Banking Company, an association organized under the general law of 1838 to authorize the business of banking. The general history of that association is stated in *Curtis* v. *Leavitt* (15 *N. Y.*, 16 – 42). The transactions out of which this suit arose were nearly contemporaneous and somewhat connected with those there described; and reference is made to that statement for an account of the course of dealings and financial situation of the company; the questions litigated in this suit being, for the most part, identical with those decided in that. The bill in this case was filed for the purpose of having a certain trust deed, called the Second Half Million Trust Deed, and all assignments accompanying the same, and four hundred and fifty bonds secured thereby, decreed illegal and set aside, and the securities transferred by such deed and assignments delivered to the plaintiff.

In June, 1840, the Bank of the United States and the Girard Bank (which will be hereinafter designated as the Philadelphia banks) were the holders of fifty certificates of deposit, previously issued by the North American Trust and Banking Company, for sums amounting in the aggregate to $499,878.78, all of which were unpaid. The Bank of the United States held thirty-five of the certificates, amounting to $232,000, and the Girard Bank fifteen, amounting to $267,878.78. Of these certificates, six, amounting to $137,181.82, were payable July 1, 1840; others of them were to become payable shortly thereafter, and all of them within twelve months.

The North American Trust and Banking Company was at this time under the pressure of great embarrassments. It had on hand little or no cash resources to meet its maturing engagements. Subsequent results show it to have been actually insolvent; but its assets were large, nominally exceeding its liabilities by nearly $3,000,000, and its offi-

cers, in the exercise of a reasonable intelligence, entertained an honest expectation of going on with its business and paying all its debts. It was known to the company that the certificates of deposit before mentioned were held by the Philadelphia banks, and that provision must be made to pay them and other debts of the like nature, which were to become payable on and soon after July 1, 1840. For this purpose the board of directors, on June 15, 1840, passed a resolution empowering its finance committee to transfer to Blatchford, Curtis and Graham, defendants in this action, bonds and mortgages to the amount of $1,800,000, to secure the company's sterling bonds payable in three years, to be issued to an amount not exceeding £337,000. Under the power given by this resolution, the finance committee, on the 17th June, 1840, directed the creation of the Second Half Million Trust, with a view of providing, by the negotiation in London of the sterling bonds which that trust was to secure, for the payment of the certificates held by the Philadelphia banks. About the same time, the company applied to the Philadelphia banks for an extension of the time of payment of the certificates, and on the 25th June, 1840, it was agreed by said banks to grant such extension, and to receive, as a substituted security for the payment of the amount of said certificates (about $500,000), mortgage bonds for the like amount, payable in five years, with interest at six per cent, to be secured by the Second Half Million Trust Deed.

In pursuance of this agreement, the Second Half Million Trust Deed was executed and delivered July 1, 1840, and the bonds and mortgages to which the deed refers, amounting to more than $600,000, were transferred by separate assignments and delivered to Curtis, Blatchford and Graham, the trustees. On the 10th July, 1840, the four hundred and fifty bonds issued under and secured by said deed were delivered to the Philadelphia banks, who afterwards surrendered the certificates of deposit to the company.

The bonds issued under the trust deed differed from the terms of the resolution of the board of directors in the time of payment, and other particulars which it is not material to state, as the decision proceeds upon the concession that there was no previous resolution of the board of directors authorizing them. They were, however, in other respects, regularly executed by the proper officers of the company, and it was expressly authorized or ratified by a resolution of the directors, passed August 5, 1840.

The form of the trust deed and of the bonds secured by it and of the coupons attached to the bonds were identical, with the exception of numbers and amounts, with those set out in *Curtis* v. *Leavitt* (15 *N. Y.*, 17–22), and the bonds had the impression of the company's seal upon the paper, without the use of wax or other tenacious substance, in the same manner there described.

Upon the dissolution of the Court of Chancery, the cause was transferred to the Supreme Court. Final judgment was rendered at general term in the first district, declaring the validity of the trust deed, and establishing the right of the assignees of the Philadelphia banks, and other holders of the bonds, to payment out of the proceeds of the property and securities embraced in the trust. The plaintiff appealed to this court.

*Samuel Beardsley* and *Greene C. Bronson*, for the appellant.

*Benj. F. Butler*, *William Curtis Noyes* and *Samuel A. Foot*, for the respondents.

HARRIS, J. The chief difference between the transactions now in question and those involved in *Curtis* v. *Leavitt* (15 *N. Y.*, 9) consists in the fact that while the obligations secured by the trust deeds in the latter case were issued for the purpose of raising money for the use of the company, the obligations secured by the trust deed in this case were

Leavitt *v.* Blatchford.

issued as a substitute for, and in payment of, certain certificates of deposit held by the Philadelphia banks against the company. The form of the instruments in each case is identical.

· In *Curtis* v. *Leavitt*, it was insisted by the counsel for the receiver, as it is here, that the trust deeds and the assignment of the bonds and mortgages to the trustees were void, for the reason that the transaction was not authorized by a previous resolution of the board of directors, as required by the 8th section of the article of the Revised Statutes relating to moneyed corporations. But it was held in that case that, though it be assumed that the transaction had not been authorized by a previous resolution of the board of directors, and though the article of the Revised Statutes relating to the insolvency of moneyed corporations were applicable to a corporation organized under the general banking law of 1838, yet, as the holders of the obligations secured by the trust conveyances were to be regarded as purchasers for a valuable consideration and without notice, they were entitled to protection under the last clause of the 8th section.

It was also insisted in *Curtis* v. *Leavitt*, as it is in this case, that the trust conveyances were void because made in violation of the 9th section of the article of the Revised Statutes before noticed, which prohibits conveyances by a corporation, when insolvent or in contemplation of insolvency, with intent to give a preference to any particular creditor over other creditors. But it was held that, whether the section relied upon was applicable to this company or not, the trust conveyances in question were not made with intent to give any preference among creditors, and therefore were not void upon that ground.

Thus the question, whether the provisions of the Revised Statutes relating to the insolvency of moneyed corporations are applicable to associations formed under the act of 1838, was, in *Curtis* v. *Leavitt*, left undecided; and as the trust deed now in question was made to secure obligations issued in

payment of preëxisting debts, and at a period when the affairs of the company were becoming more desperate, these provisions are again invoked, and the court is asked to pronounce against the validity of the transaction on the ground that they have been violated.

It will be convenient, therefore, before noticing any other questions which the case may involve, to determine whether banking associations, organized under the general banking law of this state, are subject to the provisions of the Revised Statutes relating to moneyed corporations.

Regarding this merely as a question of statutory interpretation, unaffected by anything that has been said or decided by the courts of this state, I should not hesitate to maintain the negative of this proposition. The legislature which enacted the general banking law undertook to initiate an entirely new system of banking. Under that system, banks were to be organized and conducted upon a theory entirely distinct and different from that which had hitherto prevailed. It was evidently intended that the act itself should contain within itself all the provisions necessary to carry this new scheme into effect. There is nothing in the act which justifies the inference that the legislature intended in any way to connect it with the banking system then in existence, or any provisons of law relating thereto. The radical difference between the two systems has been presented with admirable clearness and force by Judge Comstock, in *Curtis* v. *Leavitt* (15 *N. Y.*, 78 – 81). That the legislature did not intend thus to apply any of the provisions of the Revised Statutes in relation to moneyed corporations, has, I think, been demonstrated, not only by Judge Comstock, but in the very able opinion delivered by Judge Paige in the same case. (*Id.*, 182 – 188.) Although it is conceded that, by the act of 1838, attributes were annexed to the associations authorized by that act which gave them the characteristics of corporations, yet it has never been asserted, I think, that such was the legislative intent. On the contrary, the act

itself bears upon its face the clearest evidence that the legislature, in framing the act, studiously avoided this effect. Hitherto, the business of banking had been confined to chartered monopolies. Now, it was intended that all individuals and voluntary associations of individuals might, alike and upon equal terms, exercise this privilege. That these voluntary associations could be regarded as corporations, the legislature of 1838 never so much as dreamed. This discovery was left to be made by the courts. Of course, if they were not moneyed corporations, no provisions of law relating to such corporations would be applicable to these associations.

Nor were the courts at all prompt to find that the legislature, contrary to their own purpose, had really provided for the creation of innumerable banking incorporations. The subject first came before the Court of Errors in 1840, in the case of *Warner* v. *Beers* (23 *Wend.*, 103). It was elaborately discussed and views of great diversity were expressed by the distinguished members of the court who took part in the decision. That court, by a vote of twenty-two to three, declared that associations organized under the act of 1838 were not bodies politic or corporate, within the spirit and meaning of the constitution. Of course, there was as yet no ground for applying to these associations the provisions of law relating to moneyed corporations.

The opinion of the same court was again invoked in the case of *The Supervisors of Niagara* v. *The People* (7 *Hill*, 504), in 1844. The circumstances under which that case came before the court were peculiar. The assessors of the town of Lockport had placed upon the assessment roll, for taxation, two banking associations formed under the act of 1838. The board of supervisors, upon the application of these banks, had stricken their names from the roll. Two taxable inhabitants of Lockport applied to the Supreme Court for a mandamus to compel the supervisors to restore these names. The application was granted. From this

decision, singularly enough, the supervisors appealed. Senator PORTER delivered the only opinion in the Court of Errors in favor of sustaining the decision, but it was affirmed by the close vote of eleven to eight; thus holding that banking associations were so far to be regarded as moneyed or stock corporations, as to be taxable under the provisions of the Revised Statutes on that subject.

Certainly thus far, there was nothing which could be regarded as judicial authority upon the question now under consideration. And so it stood until *Gillet* v. *Moody* (3 *Comst.*, 489) was decided in 1850. In that case, Gillet was receiver of the St. Lawrence Bank. The defendant was a director. He had held $5,000 of its stock. The bank was hopelessly insolvent, and of course the stock was worthless. Under these circumstances, the board of directors, the defendant being himself present and acting as one of the board, agreed with the defendant to purchase his stock and pay him the amount in Arkansas bonds. This was done. The transaction amounted, in fact, to a gift of the bonds to Moody, a director bound, as a faithful trustee, to protect the property of the creditors of the bank. It needed no statute to enable the receiver to avoid such a transaction. This, Judge BRONSON, who delivered the opinion of the court, clearly shows. He concludes, upon this branch of the subject, by saying that "the defendant, as a director, was not at liberty to make such a bargain with himself as an individual, nor were the other directors at liberty to make such a bargain with one of their associates. The transaction, if allowed to stand, will operate as a fraud upon the creditors; or if by any possibility the fund should prove more than sufficient to satisfy them, then upon the other stockholders of the bank."

And here, I think, the learned judge might well have stopped. He had said all that it was necessary to say, to satisfy every member of the court that the judgment must be against the defendant. But then he proceeded to say, what

Leavitt *v.* Blatchford.

was certainly needless for him to say, that, in his opinion, the transaction was expressly forbidden by the statute "to prevent the insolvency of moneyed corporations." To sustain this opinion, he refers to the provisions in the first section of that act, which clearly show the transaction to be illegal, if the act itself is applicable to associations formed under the general banking law. To show that the act does apply to such associations—he states as the same distinguished judge had often stated before, and that, too, in the most impressive terms—that these associations were corporations, and moneyed corporations; not corporations in a qualified sense, but corporations to all intents and purposes. He adds, too, that "if anything can be settled by judicial decision, this is settled." "If," he further adds, "there was room for a doubt on this point, after the decision of the Court of Errors in *Warner* v. *Beers* (23 *Wend.*, 103), the decision of the same court, in *The Supervisors of Niagara* v. *The People* (7 *Hill*, 504), removed all ground for such doubt." How far these decisions really went in this direction we have already seen; and yet I am not inclined to expose myself to the animadversion of those who would regard it as presumptuous to treat the question as now open for discussion. The question is no longer of any practical importance. The associations of which we speak have many, perhaps all the essential attributes of corporations. I am inclined to think they really are corporations, although the legislature never intended they should be. At any rate, it is well enough to assume that this question is settled by judicial authority.

Having satisfied himself that banking associations were really corporations, and moneyed corporations, too, and that this had been finally settled by judicial decisions, Judge BRONSON, in *Gillet* v. *Moody*, assumed that he had also shown that the statute relating to the insolvency of moneyed corporations was also applicable to such associations. "The case comes," he says, "within the express words of the pro-

hibition. This is a moneyed corporation, it has directors, and they have applied the funds of the institution to a forbidden object. The case is not only within the letter, but it is, if possible, still more plainly within the policy of the statute." And there he leaves the question. The argument of the learned judge, fairly stated, comes to this: That though the legislature intended to throw open the business of banking, and to allow individuals and incorporated associations of individuals to engage in that business at their pleasure, and did not intend that the regulations and restrictions which had been imposed upon the chartered institutions which had before monopolized that business should be applicable to such private bankers or associations of bankers, yet, inasmuch as the legislature unwittingly went so far in declaring the powers with which these new associations should be invested as to make them, in the eye of the law, corporate bodies, therefore, the will of the legislature to the contrary notwithstanding, they are also subject to all the provisions of law which had previously been made for the government of chartered institutions. I do not understand that any such consequence follows from the premises assumed. I suppose it is enough to exempt these associations from the operation of the provisions of the Revised Statutes, if it can be made to appear that the legislature did not intend that such provisions should be applicable to such associations.

The question whether associations formed under the act of 1838 are subject to the provisions of previous statutes relating to moneyed corporations was again brought to the notice of this court in *Talmage* v. *Pell* (3 *Seld.*, 328); and yet the fact is indisputable that the question was not involved in the case presented for adjudication. The single point before the court for judgment was, whether this same company had transcended the authority conferred upon them, by the act under which they were organized, in the transactions which were then the subject of controversy. Judge GARDINER pronounced the opinion of the court. At the conclu-

Leavitt *v.* Blatchford.

sion, he says : "Without, therefore, inquiring whether the assignment in question was made when the corporation was insolvent or in contemplation of insolvency, or whether it was made in the manner required by law, I am, for the reasons suggested, of the opinion that the bank had no authority to traffic in stocks as an article of merchandise, or to purchase them for the purpose of selling as a means of obtaining money to discharge existing liabilities."

Thus, it will be seen, the only questions which required the court to determine whether the provisions of the Revised Statutes relating to moneyed corporations were applicable to a banking association organized under the act of 1838 were intentionally laid aside and left undetermined, and the decision made to depend upon the single question whether the company was authorized to traffic in stocks. The judgment of the court upon this point, in accordance with the opinion expressed by Judge GARDINER, is clearly expressed in the second resolution. And thus the case before the court was disposed of; and yet, having thus done all that the case demanded, the court did proceed, by another resolution, to declare that "every association, organized under the act to authorize the business of banking, and the acts amending the same, is a moneyed corporation, within the meaning of the statutes of the state relating to moneyed corporations, and is bound and affected by those statutes, excepting only so far as such statutes are inconsistent with the provisions either of the act to authorize the business of banking or of the acts amending the same." Of such a resolution, adopted on such an occasion, I think it may be said, as Lord BACON is reported to have said when speaking of Coke's reports, and commending their general excellence, that they had "some *peremptory and extra-judicial resolutions, more than warranted.*" As a question of judicial authority, I cannot think the proposition now under consideration gains much support from the adjudication in *Talmage* v. *Pell.*

One other case remains to be noticed. It is that of *Gillet* v. *Phillips* (3 *Kern.*, 114). This case, like that of *Gillet* v. *Moody*, grew out of the failure of the St. Lawrence Bank. The defendant in this case, as in that, was a director, and had undertaken to speculate out of the assets of the bank. After the bank had stopped payment, the cashier sold and transferred to the defendant three notes, amounting to $2,000, for $1,200. The Supreme Court, very properly in my judgment, held the transaction void, and gave judgment against the defendant for the difference between the amount of the notes and the sum paid therefor by the defendant. From this judgment there was an appeal. The case, as I learn from one of my brethren who was then a member of the court, was submitted without argument.

It does not appear that the question, whether the provisions of the title of the Revised Statutes relating to moneyed corporations were applicable to associations under the act of 1838, was ever thought of by the counsel for the defence. The only ground of defence noticed in the opinion is, that the defendant was a purchaser of the notes for a valuable consideration and without notice. Judge GARDINER, in delivering the opinion of the court, assumed that the St. Lawrence Bank was subject to the statute relating to moneyed corporations, and proceeded to show that the transaction was a violation of the eighth section of that statute. The decision was undoubtedly sound, upon the premises assumed. It is worthy of notice, in connection with this decision, that the Supreme Court, in *Gillet* v. *Campbell* (1 *Denio*, 520), Chief Justice BRONSON himself delivering the opinion of the court, had held that this same section of the statute to prevent the insolvency of moneyed corporations was not applicable to this same St. Lawrence Bank. It is but just to say, however, that Judge BRONSON, in *Gillet* v. *Moody*, says he does not feel entirely certain that the decision in *Gillet* v. *Campbell* stands upon a firm foundation.

Having thus examined the three cases which are relied upon as establishing the position that associations formed under the banking law of 1838 are subject to the provisions of the act "to prevent the insolvency of moneyed corporations," I am prepared to consider the question whether this court is now at liberty to treat the subject as open for examination. I appreciate the value of the maxim, *stare decisis*. There are cases in which its authoritative application should shut out all discussion. The doctrine on this subject is nowhere better stated than by Judge Selden, in his dissenting opinion in *Curtis* v. *Leavitt* (15 *N. Y.*, 247), where he says: "It is indispensable to the due administration of justice, especially by a court of last resort, that a point once deliberately examined and decided be considered as settled and closed to further argument." To this I agree. When a question has been well considered and deliberately determined, whatever might have been the views of the court if permitted to treat it as *res nova*, the question should not again be disturbed or unsettled. On the other hand, I hold it to be the duty of this court, as well as every other, freely to examine its own decisions, and, when satisfied that it has fallen into a mistake, to correct the error by overruling its own decision. An acknowledged error must be more venerable and more inveterate than it can be made by any series of mere concessions or extra-judicial resolutions, or even by any single decision, before it can claim impunity upon the principle of *stare decisis*. I claim to have shown already that the decisions upon the question before us are not such as to exempt it from reconsideration. The question was only involved in the decision of *Gillet* v. *Phillips*, and, in that case, it cannot be said to have been deliberately examined. Indeed, I think I may say, without impropriety or disrespect, it was not examined at all.

"It is going quite too far," said Mr. Justice Bronson, in *Butler* v. *Van Wyck* (1 *Hill*, 462), "to say that a single decision of any court is absolutely conclusive as a precedent.

It is an elementary principle, that an erroneous decision is not bad law; it is no law at all. It may be final upon the parties before the court, but it does not conclude other parties having rights depending upon the same question."

In respect to the question now under consideration, it is not too much to say that no rights will be unsettled, no rule of property will be changed, no man will be injured, by declaring that the provisions of the Revised Statutes in relation to moneyed corporations have no application to banking associations organized under the act of 1838. Indeed, I may go farther, and say that no case has ever been decided differently from what it would have been decided if this question had not been involved. No party to any litigation has ever suffered from any erroneous view which may ever have been entertained by any court upon this question. No party to any transaction can ever be prejudiced by the decision which may now be made. Under these circumstances, I feel myself at liberty to vote upon the decision of the question according to the convictions of my own judgment, untrammeled by any authoritative decision.

I have already referred to the opinions of Judges Comstock and Paige upon the principal question. The former has shown, by what has seemed to me an unanswerable argument, that the regulations which the legislature had seen fit to adopt for the purpose of preventing the insolvency of moneyed corporations are entirely unsuited to the free banking system. Under this system, the sole object of the legislature was to secure the currency which these institutions might put in circulation. This object was accomplished, not by regulations to prevent insolvency, which had been tried and found ineffectual, but by requiring adequate security, beforehand, for all the circulation which any individual or association might be allowed to issue. This being done, I agree with Judge Comstock that there was no more reason for applying to these new associations the provisions of the statute to prevent insolvency in moneyed cor-

Leavitt v. Blatchford.

porations, than the provisions of the safety fund act. The latter are not more inconsistent with the theory of the free banking system than the former.

It has also been shown by Judge PAIGE, very satisfactorily, I think, from the very structure of the general banking act, that the legislature could not have intended that associations formed under that law should be subject to the statutes then in force relating to a very different class of moneyed institutions. I may add that, even after the question, whether associations formed under the act of 1838 were moneyed corporations or not had, begun to be agitated, and the decision in *Warner* v. *Beers* had actually been made, the legislature of 1841· furnished the clearest evidence that it did not understand the provisions of the Revised Statutes relating to moneyed corporations to be applicable to associations under the general banking law, by passing a law requiring such associations to make and transmit to the bank commissioners statements of their affairs, precisely similar in all respects to those which they were already bound to make, if the act to prevent the insolvency of moneyed corporations was applicable to such associations.

Upon the whole, I am satisfied that the legislature of 1838 intended to introduce a new and independent system of banking, and to establish, for the government of institutions organized under such new system, new and independent regulations, and to leave all previous statutes relating to moneyed corporations to be applied to the chartered banks then in existence.

It only remains to ·consider such other grounds, relied upon by the counsel for the receiver to establish the invalidity of the transaction, as do not depend upon the application of the provisions of the Revised Statutes relating to moneyed corporations to associations organized under the general banking law. These grounds I propose to notice in the order in which they have been presented.

The first is, that " the conveyance is void upon its face as against creditors, because made in trust for the use of the company." This point has been directly adjudged against the receiver, in *Curtis* v. *Leavitt*. The third proposition adopted by the court in that case declares that " the trusts are not void under the statute (2 *R. S.*, 135, § 1), on the ground that they were made for the use of the North American Trust and Banking Company; it being the opinion of the court that the statute applies only to conveyances, &c., primarily for the use of the grantor, and not to instruments for other and active purposes where the reservations to the grantor are incidental and partial." So far as this point is concerned, this case is not distinguishable from that then before the court. In both cases the conveyances were made for the purpose of securing the payment of obligations to be issued by the company executing the conveyance. In each case, the transaction was, in effect, a mortgage of the securities assigned; in this case for the purpose of securing creditors, in the other for the purpose of securing the repayment of money to be borrowed for the use of the company. Nor was the transaction any the less a mortgage because it took the form of a trust. Until the obligations, to secure which the trust was created, were executed and delivered, the transaction was inchoate and incomplete. There was no trust for the use of the company. But when the transaction was completed, the conveyance became an active trust, devoting the property conveyed, in the one case to the payment of creditors, and in the other to the payment of borrowed money. There was no other trust for the benefit of the company than is necessarily incident to every other mortgage.

The next point upon which the counsel for the receiver relies is, that the conveyance is void because made with intent to hinder, delay and defraud creditors. At the time of the execution of the trust deed in question, the company was indebted to the Philadelphia banks to the amount of

Leavitt v. Blatchford.

nearly half a million of dollars. A large proportion of this indebtedness was then due, and all would become due within a year. The company was greatly embarrassed. Indeed, it could only continue its own existence by procuring an extension of the time for paying its debts. This extension was obtained by means of the trust deed and the assignments which formed a part of the transaction. The Philadelphia banks, being thus secured, were induced to extend the time of payment for five years. The effect of the transaction was to give these creditors a preference over other creditors, and to prolong the existence of the company. In all this there was nothing illegal. The company had a right, so long as it devoted its property to pay its debts, to give any creditor a preference over others. This purpose may be effected by way of a pledge or mortgage, as well as in any other way. I know of no rule of law which prohibits a debtor, even when in failing circumstances, from securing any debt he may choose to prefer by a mortgage on his property. It is but a lawful exercise of that arbitrary favoritism among creditors which, when unmixed with fraud, is always tolerated. Before the transaction can be impeached, the debtor executing the conveyance must be convicted of a design to withdraw his property from the reach of creditors. It is the intent to hinder, delay or defraud other creditors, and not the mere preference, which vitiates and destroys.

The practical effect of the transaction in question, as I understand it, was to devote so much of the bonds and mortgages transferred to the trustees, as might be necessary for that purpose, to the ultimate payment of the obligations executed and delivered by the company to the creditors upon the extension of their debts, and to retain whatever excess there might be for the use of the company. "In all cases of a mortgage," says Judge PAIGE, in *Curtis* v. *Leavitt* (*p.* 205), "whether created in the form of a trust or otherwise, the mortgagee acquires only a specific lien on the property transferred, and the whole residuary interest therein remains in

or results by implication of law to the grantor; and an express reservation of such residuary interest, being nothing more than what results to the party making the assignment by operation of law, will not vitiate the assignment. Such an express reservation has not the effect of hindering or delaying creditors. The residuary interest of the assignor may be immediately reached by his creditors by means of an execution, if the property assigned is a chattel, or by a complaint in the nature of a bill in equity, or by proceedings supplementary to execution, if the property consists of choses in action." (*Leitch* v. *Hollister*, 4 *Comst.*, 211.) It is not pretended that the case furnishes proof of any actual fraud; and as the trust deed itself does not contain any provision which necessarily has the effect to hinder, delay or defraud creditors, this ground of objection to the validity of the transaction cannot prevail.

The next point upon which the counsel for the receiver rely is, that "the conveyance is void for the reason that it was given to secure the payment of instruments called *bonds,* which were illegal contracts, because the company had no power to issue them." It is also insisted that the conveyance is void because it was made to secure obligations prohibited by the act of the 14th of May, 1840.

The first of these propositions has been disposed of in *Curtis* v. *Leavitt.* It was there held that, prior to the act of May 14, 1840, a corporation might lawfully borrow money and thus contract debts, and that it might also execute and issue any appropriate assurances for the payment of such debts. The only limit upon this power was that imposed by the restraining act, which prohibited the issuing of any evidences of debt, to be loaned or put in circulation as money, except when specially authorized by law. (1 *R. S.*, 712, § 6.) "It cannot fail to be noticed," says Judge COMSTOCK, "that this statute does not forbid either natural or artificial persons from entering into written engagements of any description, provided they are not issued to be loaned

or put in circulation as money." It needed express legisla-
tive authority to enable a banking association to issue a
paper currency to be put in circulation as money; but it
needed no such authority to enable such association to exe-
cute any contract or assurance for the payment of its debts
not expressly forbidden by law. The power is incident to
the power to contract the debt itself.

But it had been provided by the last section of the safety
fund act (*Sess. Laws*, 1829, 173) that no moneyed corpora-
tion, subject to the provisions of that act, should issue any
bill or note of such corporation, unless the same should be
made payable on demand and without interest; and by
the fourth section of the act of the 14th of May, 1840,
this provision was extended to banking associations organized
under the general banking law. As the obligations, to secure
the payment of which the trust deed now in question was
executed, were made after this law went into operation, it
becomes necessary to inquire what was their character, and
whether they were within the prohibition of this statute;
in other words, whether the "bonds," as they are called,
issued and delivered to the Philadelphia banks, are, in fact,
"notes or bills payable on time, with interest."

It is well settled that the prohibition in the act of 1840
extends to all negotiable promissory notes and bills of
exchange, whether intended to be put in circulation as
money or not. Thus, in *Leavitt* v. *Palmer* ( 3 *Comst.*, 19 ),
the notes in question were made by the North American
Trust and Banking Company, payable twelve months after
date to the order of William R. Cooke, at a banking-house
in London, with interest at the rate of seven per cent. They
were, in all respects, negotiable promissory notes. These
notes were held to be void, because issued in violation of the
statute of 1840. In *Swift* v. *Beers* ( 3 *Denio*, 70 ), the action
was upon a negotiable promissory note made by the same
company. In *The Ontario Bank* v. *Schermerhorn* ( 10 *Paige*,
109 ), the question arose upon a draft at forty-five days, issued

by a safety fund bank. The Chancellor, referring to the provision in the safety fund act prohibiting banks from issuing time paper, said: "The object of the legislature, in the adoption of this provision, undoubtedly was to prevent banks from issuing *post-notes* or *post-bills of exchange*, which might pass from hand to hand as a part of the circulating medium of the country. Experience has often shown that the *negotiable* securities of banking institutions, in whatever form and for whatever purposes they may have been issued, will pass from hand to hand as a substitute for money so long as the banks which issued them continue to be in good credit. The only safe course, therefore, in construing this restrictive clause of the safety fund act, so as to guard against the mischief intended to be remedied thereby, and thus carry into effect the intention of the legislature, is to give it a literal construction so far as it relates to *negotiable bills* and *notes* of every kind and description; and the corresponding provision in the act of 1840 should receive the same literal construction. But," he adds, "notes and drafts *not negotiable*, and which for that reason cannot be used or circulated as a substitute for money, when issued by banks in the course of their business, either as evidences of indebtedness to particular individuals or for other legitimate purposes, are clearly not within the mischiefs which the legislature intended to guard against by these prohibitory provisions, although the language used by the legislature is broad enough to cover that kind of securities also, where they assume the character of promissory notes or bills of exchange." It was accordingly held that, inasmuch as it did not appear that the draft on time, issued by the bank, was negotiable, the objection to its validity could not prevail.

The securities now before the court were not negotiable. Indeed, it is a misnomer to call them bills or notes at all; they are special contracts, four hundred and fifty in number. By each of these the company declared itself to be held and firmly bound to pay to Walter Mead or his assigns, on the

Leavitt *v.* Blatchford.

1st day of February, 1845, the sum of £250 sterling, with interest at the rate of six per cent per annum, payable semi-annually, at a banking-house in London, on the presentation and delivery of certain warrants therefor, which were annexed to the obligation. And it was further declared that the holder of that obligation, upon complying with certain conditions therein specified, should become entitled in lieu thereof to $1,200 of the capital stock of the company. Each of these instruments purports to be sealed with the corporate seal of the company. It is so declared in the attestation. The seal is in fact impressed upon the paper, but not upon wafer or wax. Upon the back of the instrument is a formal assignment, executed under the hand and seal of Walter Mead. In this assignment a blank is left to be filled up with the name of the assignee. Such an instrument, whether sealed or not, is not, in any legal sense of the term, negotiable; nor is it a bill or a note. The transaction cannot, therefore, be invalidated upon this ground.

Another point made by the counsel for the receiver is, that assuming the trust conveyance to be valid and that the bonds were such instruments as the company was authorized to issue, still the conveyance cannot be enforced as a security for the bonds, because they were not negotiated in pursuance of the trust. I do not think this point is well taken in fact. The trust deed, in its recitals, declares that it is the intention of the company to negotiate the four hundred and fifty bonds to be issued in England, but it is not made a condition of the trust that the bonds shall be so negotiated; on the contrary, it is provided that, after default shall have been made on the payment of the bonds, the trustees shall stand possessed of the securities conveyed to them in trust for the holders of the bonds. It is enough to give effect to the trust deed that the bonds are negotiated by the company in a lawful manner, and that they are held by persons who, as against the company, are entitled to enforce payment. The Philadelphia banks and their assignees are such holders.

The only other ground upon which it is sought to impeach the validity of the transaction is, that the bonds were negotiated by the company at a usurious rate of interest. Whether this is so in fact, I have not thought it necessary to inquire. By the act of April, 1850, the usury laws of this state, so far as they had before authorized corporations to avoid their contracts upon that ground, were in effect repealed. I concur entirely in the views expressed by Judges COMSTOCK, BROWN and SELDEN, in *Curtis* v. *Leavitt*, upon this question. However usurious the transaction may have been, the receiver is not in a position to avoid it upon that ground.

Having thus considered all the objections which have been presented by the counsel for the receiver, the result of my examination is, that the transaction involved in this litigation is legal and valid.

The judgment of the Supreme Court should therefore be affirmed.

JOHNSON, Ch. J. The general questions in this case were so fully discussed in the opinions delivered in the case of the Million and First Half Million Trusts ( *Curtis* v. *Leavitt*, 15 *N. Y. R.*, 9 ) as to render it unnecessary again to examine them. The objections raised against the trust deed, founded upon the 8th and 9th sections of the title of the Revised Statutes relating to moneyed corporations, ought not to be sustained. The argument, contained in the opinions of Judges COMSTOCK and PAIGE in the case cited, to show that the title in question does not apply to the banking associations created under the act of 1838, is, to my mind, conclusive. It is true that part of the opinion in *Gillet* v. *Moody* ( 3 *Comst.*, 479 ), and one of the resolutions in *Talmage* v. *Pell* ( 3 *Seld.*, 328 ), as also the decision in *Gillet* v. *Philips* ( 3 *Kern.*, 114 ), affirm the applicability of that title to these associations; but, in the two first named cases, the decision of the question was not necessary to the decision of the

Leavitt *v.* Blatchford.

causes, and in the last, which was a case submitted without oral argument, the applicability of the statute seems to have been assumed without discussion, either in the printed points of the counsel or in the opinion delivered. The fact that these associations seem verbally to fall within the definition of moneyed corporations, upon the bare reading of the title, while the complete incongruity between the moneyed corporation system of the Revised Statutes and the free banking system needs to be brought out, by a careful consideration of each system, in order to be seen and felt, will make it easy to see how the point may have escaped that close attention which it deserved. Under such circumstances, I do not think this court bound to persist in that which it sees clearly to be erroneous. Where a rule of property is erroneously settled, courts will rarely, if ever, depart from the decision, because such a departure will disturb rights acquired under the sanction of the rule; nor will they determine that to be criminal which has been decided, though erroneously, to be innocent. The reason of these rules has obviously no application, when the decision sought to be corrected is one which disappoints the expectation of the parties to an act, and renders void their contracts. There can have been no dealing between parties on the faith of any such rule. To alter such a decision does not disturb property nor interfere with any vested rights which the law is to regard; on the contrary, that course gives effect to the intentions of parties and removes an obstacle which ought not to have been interposed in their way.

A decision of the character of that in question stands therefore upon the general doctrine of *stare decisis*, unstrengthened by any peculiar considerations founded on the nature of the decision or the unjust consequences which might follow from its alteration. That maxim, although entitled to great weight, does not furnish an absolute rule which can never be departed from. That it does not, the number of overruled decisions, which have accumulated in the administration of the com-

mon law, abundantly proves. To depart from a decision is undoubtedly an act by which a court incurs a high degree of responsibility; and it should certainly be satisfied that its course is such that the future judgment of the enlightened profession of the law will approve its determination. But when it is satisfied that an erroneous determination has been made, and that, too, without a full consideration of the merits of the question decided: when it sees that to correct it will render void no one's honest acts, nor disappoint any just expectation: when, in short, it is fully persuaded that there is no one reason why such a decision should again be made, except that it was once made before, then I think a court would be sacrificing substance to shadow if it refused to correct its error. Nor do I believe that by so doing a court would disturb the public confidence in the stability of its judgments. Courts are not inclined, any more than men out of courts, to admit that they have erred; and where the administration of justice is public and must proceed upon reasons assigned for every judgment, there is little danger from the exercise, under the responsibilities which necessarily attend its exercise, of the power which a court possesses to retrace its steps when it is satisfied that an error has been committed.

In the next place, the trust deed was not void, under the general provisions of the Revised Statutes as to fraudulent conveyances. The internal structure of the deed is precisely like that involved in the other cases, and, therefore, our decision that the Million Trust Deed was not void upon its face, as fraudulent as against creditors, must control our determination upon the face of this deed. Upon that question, as well as upon the question of fact, whether it was made with intent to hinder, delay or defraud creditors, I refer to the full discussion in the opinion of Judge COMSTOCK in the former case. I am satisfied, upon the evidence, that this deed was made and executed as a part of the general plan of the company to extricate itself from its embarrass-

Leavitt v. Blatchford.

ments, in which, unfortunately both for its creditors and stockholders, it was unsuccessful; but I cannot doubt that such was its purpose, entertained in entire good faith. It contemplated going on with its business, not winding up its concerns and preferring favored creditors, and this deed, as were the others, was made for that end. The postponement of its debts to the Philadelphia banks was just as important to secure the end in view, and just as effectual, as would have been the actual receipt of the money and its application in payment of the postponed debts. The company was, perhaps, hoping against hope in regard to its affairs; but I may be allowed to say that if so great a change had occurred in the value of its property as has taken place since the first argument of this cause in October, 1857, in the value of almost every similar species of property, of which, at that time, there was no greater apparent likelihood than existed when this company was considering its prospects of successful escape from its embarrassments, I consider it far from clear that it would not, at least for the time and in respect to operations then on foot, have retrieved its affairs.

The next question to be considered is whether these instruments, called bonds, are within the 4th section of the act of 1840. ( *Sess. Laws*, 306.) That section prohibits any banking association to "issue or put in circulation any bill or note of said association, unless the same shall be made payable on demand, and without interest." It does not prohibit an association from entering into all kinds of engagements for paying money unless on demand and without interest, but only the specified kinds, bills or notes. In *Leavitt* v. *Palmer* (3 *Comst.*, 19), promissory notes were adjudged to be within this prohibition. The instruments, called bonds in this case, were undoubtedly intended by the parties to be sealed instruments, and if they are to be regarded either as English or Pennsylvania contracts, and governed by the law of those states, they are sealed instru-

Leavitt *v* Blatchford.

ments; but tested by the laws of New-York and regarded as unsealed, they are not promissory notes nor bank notes, but special engagements to pay money, or to give stock at a certain rate in lieu thereof, in case the holder should so elect, before they become payable. (2 *Strange*, 1271; *Martin* v. *Chauntry, Buller N. P.,* 272.) They are something more than an engagement to pay money, and by the terms of the contract they may not be payable at all.

It is insisted that the coupons for interest, attached, are bills of exchange. The words of those papers are those of a bill of exchange; but they, in the hands of the party who has the bond, are but a part of that agreement, and take their character from that of the instrument to which they are accessory. Could he present them to the Palmers for acceptance, and at once maintain an action against the banking company as drawers, upon non-acceptance? The answer to such an action would be plain, that from the whole instrument, they appeared not to be bills of exchange, but warrants for the semi-annual payments of interest on the principal obligations. These instruments, therefore, do not fall within the prohibition of the section in question. They are, neither in law nor in fact, notes or bills.

That the disposition made of these instruments was such as binds the corporation, is apparent from the evidence. They were used for the purposes of the association, and with the consent of the proper officers, and although not in precise accordance with the terms of the deed itself, yet for the same substantial purpose of enabling the company to escape from its embarrassments. A more serious question might exist, if the 8th section of the act in regard to moneyed corporations applied.

Upon the whole case, I think that no effectual distinction exists, to give it a different direction from the case of *Curtis* v. *Leavitt*, and that the judgment appealed from should be affirmed.

SELDEN, J. (Dissenting.) One of the points made by the appellant's counsel in this case is, that the trust deed in question is void, because not authorized by a previous resolution of the board of directors, as required by section 8, article 1, of the statute concerning "moneyed corporations." (1 *R. S.*, 589.) Upon the second argument of the cause, this point, which depends primarily upon the question whether the provisions of that statute apply to banking corporations organized under the law of 1838, was elaborately discussed, and our first inquiry will be, whether this can properly be regarded as an open question.

I am not disposed to exaggerate the value of the maxim *stare decisis*. Decisions are often made and precedents created, either from a defective argument at the bar, or a want of thorough examination upon the bench, or some other cause, which are plainly in conflict with principle; and this maxim is frequently made use of in such cases to perpetuate the error. On the other hand, none will deny the importance of stability and fixedness in the rules by which the business affairs of the community are to be controlled. Aside from the positive injustice necessarily done by changing a rule in reference to which arrangements have been made and rights acquired, nothing can be more paralyzing to all prudent and well regulated enterprise than a consciousness that the laws by which its results are to be governed are fluctuating and uncertain.

But there is another aspect in which an unstable court of last resort is productive, in this country, of evils far more serious than any amount of individual injustice, however great. Such courts are frequently called upon to decide questions in which, not individuals merely, but the whole people, take an interest, and in regard to which prejudices have become excited and passions inflamed. There must be an arbiter somewhere, to decide such questions, which will command respect, or they will be brought to the arbitrament of force; and nothing will contribute so much to

secure this respect as a steady uniformity of decision, especially in regard to questions which affect large classes of men, and which lead, therefore, more or less, to the formation of parties. The overthrow of a single decision in a case of that character, unless upon reasons so clear and conclusive as scarcely to admit of controversy, is seriously to be deprecated, as tending to perpetuate an exciting conflict of opinion.

Let us see, then, how the question under consideration stands upon precedent. One of the first cases in which the question arose was that of *Gillet* v. *Campbell* (1 *Denio*, 520). It was then held, BRONSON, Ch. J., delivering the opinion, that the provisions of the statute "to prevent the insolvency of moneyed corporations," did not apply to banking associations organized under the general banking law. Although the question was directly involved, it appears to have received but slight attention, and was summarily disposed of by the chief justice, solely upon the ground that the St. Lawrence Bank had not provided in its charter for a board of directors. It had a board of directors by whom its whole affairs were managed, but because such a board was not required by the charter, the statute was held not to apply. It is not surprising that the chief justice availed himself of the first opportunity to review this ruling. In *Gillet* v. *Moody* (3 *Comst.*, 479), the same question arose and was again examined by the same learned judge. In speaking of the case of *Gillet* v. *Campbell*, he says: "Although I delivered the opinion of the court in that case, I do not feel entirely certain that the decision stands upon a firm foundation." It is plain that these words imply far more than they would seem literally to express, for the judge immediately proceeds to assert the applicability of the provisions in question to the St. Lawrence Bank, in the strongest and most unequivocal language. He says: "The case comes in every particular within the express words of the prohibition. This is a moneyed corporation; it has directors, and they

have applied the funds of the institution to a forbidden object. The case is not only within the letter, but it is, if possible, still more plainly *within the policy* of the statute. The object of the legislature, as appears from the title of the act, was to prevent the insolvency of moneyed corporations, and to secure the rights of the creditors and stockholders." This decision is, in my judgment, entitled to greater weight than if that in *Gillet* v. *Campbell* had never been made. However it may be with courts whose members have changed, the same judges are not ordinarily inclined to reverse their own decisions, unless for the most satisfactory reasons.

Following this case came that of *Talmage* v. *Pell* ( 3 *Seld.*, 328 ), in which the point was again directly involved. It is apparent from the report of the case that the question must have been there elaborately argued, at least by the counsel for the defendant, as the printed points on that side embrace a summary of the arguments against the applicability of the statute. As this question lay directly in the way of the defendant's counsel, and as the last previous decision of the court in *Gillet* v. *Moody* was against him, it may safely be inferred, from the ability of the counsel employed, that the whole argument on that side of the case was presented. Under these circumstances, great significance and force are given to the resolution adopted by the court upon the decision of the case. That resolution declares, in the most explicit terms, that associations organized under the general banking law are moneyed corporations, within the meaning of the statutes relating to such corporations, and are bound by those statutes, excepting so far as their provisions may be inconsistent with the general law and the subsequent amendatory acts. This was the third time the question had been directly before the court; and it was apparently for the purpose of preventing any renewal of the discussion that this resolution was adopted.

The point was directly before the court and fully discussed; and I see nothing whatever to detract from the case as an authority. The argument of Judge GARDINER upon the subject is not as elaborate as upon some other parts in the case, probably because he considered it settled by the decision in *Gillet* v. *Moody*, but it is nevertheless clear and explicit. We see good reason, therefore, why the court, in the case of *Gillet* v. *Phillips* (3 *Kern.*, 114), should treat the question as *res judicata*. It had been twice adjudged by the same court upon full consideration, and rightfully regarded as settled.

In regard to the reopening of questions which have thus been repeatedly decided, much, in my view, depends upon the nature of the question. If, in a process of logical deduction from elementary principles universally admitted, the courts have fallen into an error, and that error can be clearly shown, I should, as a general rule, be in favor of correcting it, however often it may have been repeated. While errors of this kind rarely affect existing rights of property to any great degree, or extensively involve the passions or prejudices of men, they serve to introduce a false and spurious logic into a great variety of cases with which the erroneous principle may be collaterally connected or to which it may by analogy be extended. But questions like that under consideration, which enlist the feelings of many, and upon which the community in general is to some extent inclined to take sides, ought, in my judgment, to be regarded as finally settled by a single deliberate decision. If such a decision is to be overturned whenever the unavoidable changes in the court have brought in a majority of judges belonging to that class who differ with those who made it, the opinion of the latter will be likely to share no better fate, should the course of events afterwards restore the court to its former condition. If such questions are opened on one side they will be on the other, and the conflict will be without end.

But I feel no reluctance to discussing this as an original question, independent of all authority. Whether the ingenious and cogent reasoning urged in opposition to the series of decisions referred to can be wholly refuted or not, it may I think at least be shown that this reasoning is not so entirely conclusive as to justify the disregard and overthrow of those decisions; especially as the effect of such overthrow will be, not to mitigate or remove any admitted evil, or to introduce any rule which justice requires, but to exempt a large and important class of corporations or their officers from certain legislative restraints, enacted for the sole purpose of securing integrity and prudence in the management of their corporate affairs.

The argument against the decisions in question is very clearly and forcibly presented in the opinion delivered by my learned associate, Judge COMSTOCK, in the case of *Curtis* v. *Leavitt* (15 *N. Y.*, 9). As this argument was virtually adopted by the counsel for the respondents upon the reärgument of this cause, and as nothing very material was added to it upon that occasion, it is safe to assume that it embraces, substantially, all that can be said upon that side of the question. Its main positions are these: That the system of banking which prevailed in this state from 1791, when the Bank of New-York was chartered, to 1838, when the general banking law was passed, was false and vicious, and wholly failed in accomplishing that which should have been its chief object, viz., the protection of the public against an unsound currency: that it imposed unnecessary restrictions upon the business of banking, and erected it into a monopoly which ultimately became odious: that after various legislative efforts to improve and perfect the system, among which were the act to prevent the insolvency of moneyed corporations, passed in 1827, and the safety fund law of 1829, all of which proved ineffectual, the truth was at last perceived that banking is a mere business, and not a franchise: that the whole duty of government in regard to it

consists in so regulating the department of issues as to render the currency secure, and that, in all other respects, it may, like any other business, be safely left to individual and associated enterprise : that a new policy was thereupon adopted, in accordance with this theory, leading, first, to the act of 1837, by which the restraining law was partially repealed, and then to the law of 1838, by which the previous system of banking was wholly subverted and a new system instituted in its place : that the leading idea of the new system was, that all issues for the purposes of currency should be rendered secure, and that, beyond this, the business of banking should be left entirely free and untrammeled ; that this was the obvious design of the legislature, in enacting the general banking law, and hence it could not have been intended to retain any of the restrictions of the old and exploded systems.

Full justice could not, of course, be done, in this brief summary, to the argument of my learned associate, which will be found at large in the case of *Curtis* v. *Leavitt* ( 15 *N. Y.*, 74–83) ; but it is sufficiently set forth to render my answer to it intelligible. Its success in convincing some of my associates is to be attributed to the many elements of truth which it contains. Its history of our former banking system : of the entire failure of the various restrictions, successively imposed upon it, to accomplish the object of producing a sound currency : its account of the gradual progress of public opinion, both in England and in this country, towards what it calls the grand central idea, that the whole duty of government, in respect to the business of banking, is performed when it has rendered the currency secure : and its assumption that the law of 1838 was enacted under the influence of this idea, and was intended to inaugurate a system entirely new, in place of that which had so signally failed, were all just and true.

But the inference drawn from this series of undeniable truths is entirely unwarranted, as can, I think, be very

clearly shown. While it is true that banking, when carried on by individuals or by unincorporated associations, is a business and not a franchise, and perhaps, also, that when so conducted it requires at the hands of government no regulation except such as will secure the issues made for the purposes of currency, yet, banking by a corporation, under a legislative act, is a franchise, and is attended by various contingencies and hazards peculiar to corporate bodies. It is indispensable, in considering this question, to discriminate between those provisions and principles of law which apply to banking as a mere matter of business, and those which apply to banks as corporations. The non-observance of this distinction has, in my judgment, led to most of the difficulty on this subject.

The act to prevent the insolvency of moneyed corporations is part of a general code, embracing all corporations. The first title of the chapter in which it is found relates to turnpike corporations, the second to moneyed corporations, and the third to corporations in general. This code was the result of the experience of the state in regard to the liability of corporations, as such, to certain peculiar species of abuses and frauds. Of course, the nature of the abuses would depend somewhat upon the nature and objects of the corporation; and hence, provisions intended to guard against these abuses would naturally be adapted to the peculiar character of the corporation. Thus, we find turnpike corporations in one class, and moneyed corporations in another; but the provisions concerning the latter class are not made applicable to them as banks, but as corporations. If the banks to which these provisions apply had consisted of mere associations, not incorporated, there would have been no necessity for the enactments.

That the act in question was not aimed at the banking powers of these institutions, but at their corporate powers, is conclusively shown by the fact that it embraces two other classes of corporations, as well as those for banking

purposes.  A very few only of its provisions apply exclusively to banking corporations; by far the greater portion, including those in question here, being applicable to insurance and pawnbrokers' companies, as well as to banks.   It is evident that the act had no special relation to the business of banking, except as that, in common with many other kinds of business, was connected with the usual corporate powers and franchises.   The truth is, that the act is a part of the general policy of the state in regard to corporations. That policy embraces every kind of business carried on through the instrumentality of corporate bodies, including, of course, that of banking, so far as it is connected with the exercise of corporate powers, but no further.

This view of the subject, which seems to me so plain and simple as to admit of no dispute, is, if just, entirely fatal to the argument under review.   That argument is, that the state, having adopted a policy wholly new in regard to banking, all its previous policy on the subject was evidently intended to be abandoned.   But what, I ask, has any change in the policy of the state, with respect exclusively to banking, to do with its established policy in regard to corporations in general?   Take, for instance, section seven of the act in question, which provides, in substance, that no conveyance made for the benefit of a moneyed corporation shall be valid, unless made directly to the corporation by name. . The object of this provision appears to have been to prevent the property of the corporation from being placed beyond the control of its board of directors.   It was intended as much for the benefit of stockholders as of creditors, and is applicable as well to the other corporations named in the act as to those for banking purposes.   Hence, it could have had no peculiar connection with the banking policy of the state, and could not possibly be affected by any change in that policy. It would, therefore, have applied in all its force to banking corporations under the law of 1838, but for the provision in section 24 of that law, requiring conveyances of real

estate to be made to the president, or such other officer as should be designated for that purpose. To the extent of this latter provision, the legislature appears to have departed from the policy which prevailed in 1828.

What has been said in regard to the objects of section seven is also true of section eight. The original note of the revisors upon these two sections is as follows: " To prevent a fraudulent application or transfer of the property and funds of a company, by its directors or officers." It is plainly to be inferred, from this note, that these sections were intended for the protection, not only of creditors, but of stockholders also. That the legislature had the interests of stockholders in view, in passing the act, is conclusively shown, not only by its title, which expressly declares that it is enacted " to secure the rights of creditors and stockholders," but also by several provisions in the body of the act itself. Thus, section 10 provides that " every director, who shall violate or be concerned in violating any provision in the preceding. sections of this article contained, shall be liable personally to the creditors and *stockholders*, respectively." Again, section 15 provides that, " in every case of fraudulent insolvency, the directors of the insolvent company by whose acts or omissions the insolvency was wholly or in part occasioned, and whether then in office or not, shall each be liable to the *stockholders* and creditors of the company."

It will be difficult, I think, to show that a change of policy, in regard to the proper mode of securing the public against the frauds or abuses of banks, can legitimately operate to subvert provisions designed to prevent the stockholders of every species of moneyed corporations from being defrauded by their official agents. In so far as the law of 1838 has severed the connection between banks and corporations, it has, no doubt, exempted the former from all previous restrictions. I entirely assent, therefore, to the reasoning of Judge COMSTOCK, when, in speaking of the

law of 1838 (15 *N. Y.*, 79), he says that we have, in the first fourteen sections, a system of banking, in the particular department of issuing currency, "so rounded and complete in itself as to exclude all antecedent legislation," and that there would seem to be no "possibility of incorporating into it either the provisions or policy of the codes of 1828 or 1829, relating to a system fundamentally different."

Certainly not: because those provisions apply solely to corporations, and the first fourteen sections of the law of 1838 confer no corporate powers. But when, by the subsequent sections, the creation of corporations is authorized, what prevents the application to them of the permanent statutory regulations intended for all such cases? There has been no change of policy which affects in the least the reasons upon which those regulations were adopted. Individual bankers, and unincorporated banking associations, act under all the restraints of a personal responsibility for the debts incurred; but banking corporations are exempted from these restraints, as well under the general banking law as prior thereto, and their officers possess the same facilities, and are under the same temptation, to perpetrate frauds since as before its enactment. It is in accordance, therefore, with the policy of the state, which has undergone no change since 1825, to apply to banks, when incorporated, restrictions not imposed upon private individuals or mere associations engaged in banking. The argument under consideration may be regarded as conclusive, when applied to the provisions of the safety fund act of 1829, which consisted simply of a system of banking, for which, as an entirety, the general banking law may well be considered as a substitute. But in regard to the provisions which form a part of the general policy of the state in respect to corporations, it is, in my judgment, without force, except such as it derives from a more or less confused intermingling of ideas relating to banking, as a mere species of business, with those which relate to corporations as such.

My learned associate has, however, found one or two other reasons for his conclusion. In speaking of the act concerning moneyed corporations, he says: "Some of the provisions of that act are absolutely incongruous, and cannot by any ingenuity be made to harmonize with the law of 1838." This remark must, I apprehend, refer to those portions of the act of 1838 which permit the business of banking to be carried on by private bankers and unincorporated associations. I have not discovered that there are any provisions of the act to prevent the insolvency of moneyed corporations which may not be applied to banking corporations created under the law of 1838, as well as to those previously existing; and as no one ever contended for the application of those provisions to individuals or associations not incorporated, the suggestion referred to is, of course, without weight. But were it true that some parts of the act in question could not readily be applied to this new class of corporations, it would argue nothing against the applicability of other portions concerning which no such difficulty exists. The act is general, and intended to apply to different classes of corporations, and there is no incongruity in applying them to each class so far as they are applicable, and no further.

I come now to the only branch of the argument which strikes me as entitled to any very serious consideration. It is said that some of the provisions of the act to prevent the insolvency of moneyed corporations are inserted in the general banking law itself, and this is very properly insisted upon as evidence that it was not intended that the whole of those provisions should apply. I am not disposed to deny the force of this argument, but I nevertheless contend that it is met in this case by an argument of still greater weight. Section 61 of the act in question (1 *R. S.*, 599) defines the term "moneyed corporations" as including, among others, all corporations for banking purposes; and section 62 provides that the provisions of that act should be

construed to apply to every moneyed corporation created, or whose charter should be renewed or extended, after that time, unless such corporation should be "*expressly exempted*" from its provisions "in the act creating, renewing or extending such corporation."

These, in common with all the other provisions of the act, remained in full force when the law of 1838, authorizing the creation of any number of banking corporations, was passed, and yet the latter law contained no provision "exempting" such corporations from the act in question. By the terms of these several enactments, therefore, the new class of corporations are as directly within the provisions of that act as it is possible for language to bring them. This my learned associate calls a "logic of words." True, it is a logic of words; but it is equally a logic of ideas, if words can be made to express ideas. Here, then, we have the only real arguments upon this question, face to face. On the one hand, we have the plain, explicit and unequivocal language of the statutes, expressly subjecting these corporations to the provisions in question. On the other, we have nothing in the nature of an express exemption, but merely an inference, founded upon the maxim *expressio unius exclusio est alterius.* Under these circumstances, ought not the express provisions to prevail over the inference? especially as no reason can be seen, or has ever been suggested, for enacting the law in reference to former moneyed corporations, which does not apply with equal force to those authorized by the law of 1838.

But it has been said, and was said by one of the learned counsel upon the argument of this case, that the legislature did not intend to make associations under the general banking law, corporations at all, and therefore could not have intended to subject them to provisions applicable solely to corporations; and we were furnished with an able and elaborate printed argument to sustain this position. It is too late now to consider the question whether these associ-

ations are corporations. That question, at least, is settled, as has been generally conceded by both judges and counsel ever since this and its kindred cases arose. Can we then hold that banking associations are corporations, and at the same time assume that the legislature did not intend to make them so? This would be a judicial solecism of the grossest kind. Statutes are but the expression of the legislative will; and the two ideas, that the legislature has made a law, and that it did not intend to make it, are mutually and directly repugnant.

It is judicially settled, therefore, that the legislature, in passing the general banking law, intended to provide for the creation of an important class of moneyed corporations; and, upon the well settled rules of statutory construction, we are bound to presume that they did this with full knowledge of the provisions subjecting all such corporations to the statute in question, unless "expressly exempted" therefrom. The inference, from the want of any such exemption under such circumstances, that the legislature intended to leave these new corporations to the operation of that statute, is irresistible, and must supersede any inference to be drawn from the circumstance that two or three of the provisions of the statute were inserted in the general banking law itself. The insertion of those provisions is easily accounted for, from the well known fact that some at least, if not all those originally concerned in framing the law, imagined that they had succeeded in providing for the existence of a class of associations which should be endowed with all the powers, privileges and immunities of corporations, without being subject to any of their disabilities; and it is not in the least surprising that the legislature was not careful to strike them out, as their remaining could do no harm.

Nor does the fact, that by several statutes passed subsequently to the law of 1838 certain provisions of the act to prevent the insolvency of moneyed corporations were made applicable to banking associations under that law, militate

at all against the argument which has been here advanced. When those statutes were passed, the judicial controversy as to the nature of those associations was still pending, and it was uncertain whether they would ultimately be held to be corporations or not. The statutes in question show at least the legislative sense of the propriety of the provisions; and as they would not apply in case the associations were decided not to be corporations, there was good reason for their being made the subject of special enactment.

But I will not pursue the argument further. If what has been said does not prove, as I think it does, that the decisions of this court upon the question under consideration rest upon the soundest principles of statutory construction, it is, I trust, sufficient at least to show that they are not so manifestly erroneous as to justify their being overruled after being so often deliberately repeated. No question of practical justice is involved. It is a mere conflict of opinion. As, therefore, no valuable end is to be attained by reversing what has been heretofore decided, I, for one, protest against such an exhibition of mutability on the part of the court.

My conclusion, therefore, is, that the provisions of section eight of the article of the Revised Statutes, concerning moneyed corporations, are applicable to this case; and I am unable to concur in the opinions expressed by some of my associates, that, assuming the applicability of that section, the want of a previous resolution may be supplied by a subsequent ratification of the conveyance.

The judgment of the Supreme Court, therefore, should, in my opinion, be reversed.

STRONG, J., also dissented; DENIO, J., having been consulted while at the bar, did not sit in the case.

Judgment affirmed.