THE PEOPLE, *ex rel.* The Genesee County Bank, *vs.* OLMSTED and others, assessors, &c.

A banking association, organized under the general banking laws of this state, has the power, by a resolution of its board of directors, voluntarily to dissolve itself and close its business, and to distribute a portion of its capital and surplus earnings, among the stockholders.

And after such a resolution has been adopted, and a dividend upon the capital stock has been made, and paid to the stockholders, and an equal amount of its stock surrendered and canceled, it is erroneous for the assessors to assess the association on its entire capital as it existed prior to the dissolution and the making of the dividend. DAVIS, J. dissented.

If the assessors, on application being made to them, refuse to reduce an assessment thus made, by deducting from the capital of the bank the amount of capital so distributed among the stockholders, a mandamus will lie.

THE relator in this cause is a banking association, organized and doing business in the village of Le Roy, in the county of Genesee, under the general banking laws of this state. Its organization was effected on the fourth of December, 1838, and its business was carried on as a banking association until the first of May, 1865. At that time it had a paid up capital of one hundred and fifty thousand dollars. Under the articles of association, the power was conferred upon its directors of carrying on the business of banking in such manner as they might see fit, for any purpose authorized by the general banking law, and to exercise all the incidental powers necessary to· carry on such business ; and also to exercise such other powers, and transact such other business as the association was, or might be authorized by law to exercise and transact.

On the first day of May, 1865, the directors of the association, who owned over four fifths of its stock, at their regular annual meeting, unanimously adopted a resolution to wind up and close the bank on the first of July thereafter. And such directors and the stockholders of the association, with the exception of three, entered into an agreement to take stock in the First National Bank of Le Roy, an association organized under the act of congress providing for the organ-

ization of banking associations, and to increase its capital from one hundred thousand to one hundred and fifty thousand dollars.

After the adoption of that resolution, the Genesee County Bank proceeded to collect in its debts, and on the first of July, 1865, surrendered its banking office to the First National Bank of Le Roy, and since then has transacted no other business than such as was necessarily incidental to the closing and winding up of its affairs.

On the first of July, 1865, the directors adopted another resolution, that the bank should be wound up and closed as soon as practicable, and to that end a dividend of forty-eight per cent of the capital stock, and nineteen per cent of the surplus earnings and profits should be paid to its stockholders. And on that day such dividends were made and paid to the stockholders. In that manner the sum of seventy-two thousand dollars of the capital of the bank was divided among its stockholders, and an equal amount of its stock surrendered and canceled.

The defendants, as assessors of the town of Le Roy, in making their assessment of taxes in the year 1865, assessed the bank on its entire capital as it existed prior to the first of July, 1865, deducting only the value of its real estate, and the amount of twelve thousand dollars invested in United States bonds.

Upon an application being made to them on the fifteenth of August, they declined to reduce the assessment by deducting from the capital of the bank the seventy-two thousand dollars distributed among the stockholders, claiming that the directors were not empowered to dissolve the association, or reduce its capital, without legal proceedings.

The circulation of the bank, on the first of May, 1865, amounted to seventy-two thousand two hundred and seventy-eight dollars, and on the first day of July, to sixty-six thousand nine hundred and twenty-seven dollars, and on the

fifteenth of August, to sixty-two thousand two hundred and twenty-seven dollars.

Upon the relation of the bank, an alternative mandamus was issued out of this court, to the assessors, returnable at the September term of the special term, held in Orleans county. Both the writ and the defendants' answer contained a statement of the facts already set forth. The relator demurred generally to the answer. Judgment upon the demurer was given in favor of the relator, and a peremptory mandamus directed to be issued. From that judgment and direction the defendants appealed.

*L. N. Bangs,* for the appellants.

*R. Ballard,* for the respondent.

DANIELS, J. By the articles of association the board of directors was declared to consist of not less than five nor more than thirteen directors. To render a person eligible for that position, and qualify him for the exercise of the power and authority incident to it, he was required to be a stockholder to the extent of ten shares of one hundred dollars each. When elected in the manner provided for by the articles of the association, the board of directors was empowered to appoint a president of the bank from their number, and a vice president and cashier, together with such other officers and agents as the business of the association should require. The board was also empowered to carry on the business of banking, in the manner provided for by the statute, and the articles expressly and irrevocably delegated to it all the power, rights, and privileges of each and all of the associates, and of those who might afterwards become such, to be exercised only by the board of directors, and such officers and agents as it should appoint.

From this ample and comprehensive delegation of authority, the board of directors were authorized to exercise on

· account of it, all such powers, as the statute conferred upon the association. And if that statute as it was first enacted, or has been since amended, empowered the association voluntarily to dissolve itself, or to reduce and distribute its capital among its stockholders, that power could be well exercised by the board of directors, unless its exercise has been made dependent upon the action of the association itself.

It is not necessary to complicate the consideration of this question, with that so often discussed and examined, whether an association formed under the general banking laws of this state is, or is not, a corporation. So far as this case is concerned, it will be assumed, as it not improperly may be, that it is a corporation, (*Leonardsville Bank* v. *Willard,* 25 *N. Y. Rep.* 574,) though not a moneyed corporation within the statutory regulations adopted for preventing the insolvency of corporations of that description. (*Leavitt* v. *Blatchford,* 17 *N. Y. Rep.* 521.) For not being a moneyed corporation, it was not within the prohibition contained in the statute declaring that it shall not be lawful for the directors of a moneyed corporation to divide, withdraw or in any manner pay to the stockholders, or any of them, any part of the capital stock of the corporation, or to reduce such capital without the consent of the legislature. (2 *R. S. 5th ed.* 217, § 1.) That was intended to relate exclusively to what the statute denominates moneyed corporations, and has never been expressly, or constructively, applied to banking associations, even though corporations. As this is the only express statutory prohibition relating to the reduction or division of corporate capital, the association in question was not disabled by any positive provision of law from either reducing or dividing its capital, except however in the single instance, that where the reduction should be made with the intention of continuing the banking business, it could not be extended so far as to reduce the capital below the sum of $100,000. (*Laws of* 1859, *p.* 627, § 1.)

If the power to divide the capital and dissolve the associ-

ation exists, there is nothing in the statute preventing the board of directors from exercising it, where, as in this case, they were expressly and irrevocably vested by the articles, with all the powers appertaining to the association itself. If the power, under such a delegation of authority, were to be improperly, or injudiciously, made use of, the stockholders and creditors alone would have the right to complain. Where no complaint comes from them, but on the other hand they appear to acquiesce in the use made of it, those having no interest, either direct or indirect, in the affairs of the association, should not be permitted successfuly to urge the objection. In this case, the directors, by whose resolution the proceedings were taken to close up the business and dissolve the association, were the owners of its capital stock to the amount of $122,800, leaving only the amount of $27,200 of stock in the hands of others, from whom no complaint whatever seems to have come.

. . For the purpose of determining whether the power to dissolve the association was vested in it, the nature of the statute under which it was formed and the peculiar character of the institution it provided for creating, must be taken into consideration. This statute, as it has been judicially construed, was not originally designed for the creation of associations, although in practice it seems to have been attended with a different result. For the courts have felt compelled to regard the associations formed under the statute as corporations, notwithstanding the conviction that the legislature did not intend them to be so. The intention of the legislature was to regulate the business of banking in such a manner as to leave all who were disposed to do so, at liberty to engage in it, provided the redemption of their circulating notes were properly and adequately secured. And to accomplish that end, it provided three distinct modes of carrying the business on; by individuals, by partnerships properly so called, and by associations possessing several of the common attributes of corporations, united with some of the

elements of a mere partnership. Among the powers of corporations conferred upon them by the statute, in addition to that of issuing circulating notes, were those of the transferribility of stock, their continued existence notwithstanding the death or insanity of any of the stockholders, and the exemption of the shareholders from personal liability on account of the debts of the association, unless otherwise declared in the articles. (2 *R. S. 5th ed.* 560, §§ 191, 197.) These were conferred upon them for the more convenient transaction and continuance of their business, not for the purpose of making them corporations. (*Leavitt* v. *Blatchford, supra.*) And one of the powers and incidents of a mere partnership which these associations are claimed to possess is that which was resorted to in this case, for the purpose of dissolving the relator and closing up its business.

As it is settled by authority, as well as the peculiar nature of the general banking law, that the legislature did not intend the associations formed under it, to be corporations within the common legal understanding of that term, it could not have formed any part of the legislative design, that the power of voluntarily closing up their business and producing their own dissolution, should be denied them. Under that intent, their power in this respect would be very much like that of an ordinary partnership, but when exercised, as required by law to be, in conformity with certain regulations intended to prevent the abuse of it, and to render its exercise both convenient and safe.

Hence, without conferring the power in express terms, the manner only in which it may be rendered available, is declared and regulated by the statute ; indicating at the same time the understanding of the legislature that the power inhered in the association, without any express provision declaring that to be the case. That such was the understanding of the legislature, will be seen from an examination of the general banking law, and the amendments since made to it. By section 28 of the law as it was originally adopted, dividends are

prohibited from being made upon the stock, where any por-
tion of the original capital of the association has been with-
drawn for any purpose whatever, where outstanding and un-
satisfied debts exist, until the deficit be made good. (2 *R. S.*
*5th ed.* § 205.)   And by the act of 1841, it was provided
that when the officers of any banking association, desirous of
relinquishing the banking business, shall have redeemed at
least ninety per cent of their circulating notes, and deposited
in the manner required, a sufficient sum of money for the
redemption of the residue, it shall be lawful to surrender to
such association the securities deposited for the security for its
circulation.   And after giving the notices provided for in the
next section, and the bond described in it, for the redemption
of such circulating notes as shall remain unredeemed at the
expiration of two years, within six years afterwards, the asso-
ciation is entitled to receive all other securities which may be
held or be on deposit, for the redemption of such notes.
(2 *R. S. 5th ed.* 565, §§ 216, 217.)   And by section 5 of the
act of 1857, the superintendent of the banking department
is required to destroy, or cause to be destroyed, all bank note
plates in his custody, of banking associations which have
failed, or given notice of closing their business, or whenever
any banking association shall fail, or discontinue the business
of banking.   (2 *R. S. 5th ed.* 569, § 229.) . By chapter 236
of the Laws of 1859, page 503, these provisions were still
further amended, but not in such a manner as to impair the
powers of the association in this respect ; but further pro-
viding, that the banking association, giving notice to the
superintendent of the banking department of its intention
to close the business of banking, after the full payment of
all its circulating notes presented for redemption within the
time specified, and of all other lawful claims and demands
against such bank, may divide the remaining property and
effects of the banking association among the stockholders
thereof.   (*Id. page* 504, § 5.)

  These provisions, which were all in full force when this

bank resolved to wind up its affairs, and when its surplus profits and forty-eight per cent of its capital was distributed among its stockholders, and an equivalent amount of its stock surrendered and cancelled, leave no doubt as to the design of the legislature, that associations of this character should possess the power to settle up their own affairs and secure their own dissolution by observing the regulations which they provide. This conclusion is still further fortified by section 4 of chapter 419 of the Laws of 1847, page 521. For after providing that banking associations shall be subject to taxation on the full amount of actual capital paid in or secured to be paid in, it is declared that in case the capital has been reduced by the surrender of any securities to the stockholders thereof, and the certificates of stock held on account of such securities surrendered to the association and cancelled, such banking association shall not be subject to taxation upon such part of its capital. After the enactment of this statute, it furnished the measure of the liability of banking associations to taxation, until that was changed in 1853. That change rendered all moneyed or stock corporations, deriving an income or profit from their capital, liable to taxation on the amount paid and secured to be paid in, as capital, together with all surplus profits, or reserved funds, exceeding ten per cent of their capital, after deducting the value of the real estate owned by the corporation, and the amount of its stock owned by the state, or any incorporated, literary or charitable institutions. (*Laws of* 1853, *ch.* 654, §§ 1, 10.) All corporations were rendered taxable in the same manner under this law, until 1857, when it was changed by chapter 456 of the laws of that year. By this alteration the capital was required to be assessed according to its actual value, together with its surplus profits, or reserved funds, exceeding ten per cent of its capital, and deducting all shares of stock in other corporations, owned by the corporation taxed. In 1863, this act was again changed by chapter 240 of the session laws of that year, so far as banks, banking

associations and other moneyed corporations and associations were affected. This made them liable to taxation, not upon their capital and profits directly, but upon a valuation equal to the amount of capital stock paid, or secured to be paid in, and their surplus earnings, less ten per cent of such surplus, and deducting the value of real estate taxable as such.

Under all these different and fluctuating statutes, except that of 1857, which rendered corporate capital taxable according to its actual value only, the corporation or association taxed was entitled to no deduction whatever, on account of losses reducing the actual below the par value of the capital. In that respect the rule was rigid and inflexible, which declared the standard of taxation to be the capital paid in, or secured to be paid in. (*People* v. *Supervisors of Niagara*, 4 *Hill*, 20. *People* v. *Commissioners of Taxes, Am. Law Reg. vol* 12, 535.) Although the last case was reversed by the Supreme Court of the United States, its authority in this respect was in no manner disturbed. (*Bank Tax Case*, 2 *Wallace*, 200.) Indeed the principle, as a rule of construction, had been fully established by the cases previously cited, and the case of *Farmers' Loan and Trust Co.* v. *Mayor of New York*, (7 *Hill*, 261.)

If that part of the act of 1857, which relates to this subject, had continued in force, it would have furnished sufficient authority for the exoneration of the relator from taxation so far as its capital was distributed and its stock cancelled. For to that extent, certainly, the value of its capital would have been diminished. But that part of this act was repealed by the statute providing for the taxation of these associations, which was enacted in 1863.

The mere reduction of the capital, under chapter 277 of the Laws of 1859, with the intention of continuing the business of the association on the amount to which it might be reduced, would probably have the effect of rendering that the future measure of its taxation. For after such reduction, the residue remaining would constitute the capital paid in,

The People v. Olmsted.

or secured to be paid in, within the meaning of the present law for taxing banks and banking associations. But this case does not fall within these provisions of the act of 1859. For that act relates only to reductions made with the intention of continuing the business of the association. And for that reason the law prohibits any reduction below the sum of one hundred thousand dollars.

The statutes affecting banking associations, formed under the general banking law, have been more flexible than those relating to moneyed and other banking corporations. They have been secured a more ample control over themselves, and their capital and circulation. For, as has been seen, they may reduce the latter, and after its redemption and the payment of their debts, divide their entire assets among their stockholders, and produce their own dissolution without the intervention of the legislature or the assistance of any legal proceedings whatsoever. Their action, in this respect, is very much like that of an ordinary partnership. For the attainment of those ends, other banking, and all moneyed corporations, are necessarily dependent upon proceedings instituted in a court of law or equity, or the direct intervention of the legislature. (12 *Am. Law Reg.* 544. 2 *R. S.* 5th ed. 517, § 1.)

And as those powers were secured to banking associations, as distinguished from other banking and moneyed corporations, it was both just and necessary, in order to render them available and useful, that a corresponding provision should be enacted in the laws regulating the mode of taxing them. It could not have been the intention of the legislature to allow the association, whose capital had been distributed among its stockholders in the manner contemplated by law, to be made the subject of taxation precisely the same as though no such distribution had been made.

Accordingly it will be found, that while changes have frequently been made since 1847, affecting the extent and manner in which these associations were to be taxed, and

essentially modifying, if not actually repealing, the first branch of the fourth section of the act then adopted, the latter branch of the section has been neither repealed nor modified in any manner whatever. The statutes passed since that time have dealt only with the extent and manner of taxing the association while it continued its business as such, and not with the regulation or declaration of its measure of taxation, while the process of division and dissolution might be lawfully proceeding. The only positive provision of law referring to that state, in such a manner as to expressly regulate and adapt the exercise of the power of taxation to it, is that already referred to, which is contained in the act of 1847.

So much of this section of that act as prohibits banking associations, formed under the general banking laws, from being taxed upon that part of their capital distributed among the stockholders, and for which an equivalent amount of stock may have been surrendered and cancelled by the association, must be regarded as applying to the consideration of this case. For as it has not been expressly repealed, and there is no such conflict between it and the subsequent laws, relating to the same general subject, as to produce its repeal by implication, it must still continue in force. The well established rule on the repeal of statutes by implication, is that a preceding statute shall not be regarded as repealed by those succeeding it, unless they are so manifestly repugnant as to be incapable of standing together. There is not only an entire absence of inconsistency between these statutes, but in addition to that, the later ones, except the act of 1857, which was in substance, in this respect, like the act of 1847, seem to contemplate the continued existence of this branch of section four, in the act of 1847. And the general banking system would be imperfect and defective without it.

The right of the relator, therefore, to be exonerated from taxation upon that portion of its capital distributed among its stockholders, so far as positive law upon the subject can

be found, must depend upon that act and the construction which should be given to it.

It appears by the defendant's answer that at the time they were applied to by the relator to reduce the assessment, its circulating notes had been reduced to the sum of sixty-two thousand two hundred and twenty-seven dollars, which was less than the amount for which it admitted its liability to be taxed. But this was not made to appear to the defendants at the time of the relator's application to reduce the assessment. And if they had then refused to make the reduction on account of the absence of that proof, it is probable that the objection would be allowed to prevail against the present application of the relator, because the statute prohibits the assessment from being made upon a valuation less than the amount of the circulating notes unsurrendered, even though the capital of the association may have been reduced below that. The defendants, however, placed their refusal to reduce the assessment on the ground that the directors were unauthorized to reduce or distribute the capital of the association without taking proceedings for that purpose in law or equity. This excluded the supposition that the proofs exhibited were in any other manner defective. If that objection had been taken, the answer discloses the ability of the relator to have removed it by further proofs. And under those circumstances, it would not only be unjust, but opposed to very well settled authority to permit the defect to have any weight in the present disposition of this case. So far as the objection actually made is concerned, it has already been shown to be entirely untenable.

It is quite evident from this statute that the legislature intended that the association should not be liable to taxation upon that part of its capital returned to its stockholders, and for which they had surrendered certificates of stock which the association had cancelled. Subject to the provision that the capital for the purpose of taxation should not be estimated below its circulating notes not returned to the superin

tendent of the banking department, the amount of the capital liable to taxation is made entirely dependent upon the action of the association and its stockholders. If the association received securities from its stockholders for the amount of stock issued to them, then upon the return and cancellation of the stock and the surrender to the stockholders of such securities, that part of the capital previously represented · by such stock and securities, is no longer liable to be taxed. The same result must follow, where the stockholder ·has actually paid for the stock in money. For although not technically falling within the signification of the term securities, it is held by the association for the same purpose, namely, as part of its capital. And when surrendered to the stockholder for his stock which is cancelled, precisely the same effect is produced upon the capital of the association, and in each case the amount withdrawn from taxation, as the capital of the association, is added to and becomes taxable as the ·property of the individual receiving it. It could not have been the intention of the legislature to have distinguished the case of the stockholder who receives the money upon the surrender and cancellation of his stock, from the case of him who receives securities for the same consideration. The term securities, as it is used in this statute, must therefore be construed to include whatever the association may have received as an equivalent for the stock, whether it be money or securities, in the proper and ordinary sense of the word.

The judgment should be affirmed.

GROVER, P. J. and MARVIN, J. concurred.

DAVIS, J. dissented.

                     Judgment affirmed.

[ERIE GENRRAL TERM, May 7, 1866. *Davis, Grover, Marvin* and *Daniels,* Justices.]