1814.

BRADWELL
v.
WEEKS.

*S. C. *ante*, 108.

Ordered accordingly.

━━━━●:✳:●━━━━

Sept. 13.    BRADWELL AND OTHERS, *infants*, &c. against WEEKS,
                    *administrator of* BRADWELL.

An *alien enemy* may take *personal* property, by succession, as next of kin, and is entitled to a distributive share, under the act for the distribution of intestate estates; though he cannot recover it during a war, but it remains in the hands of the administrator, in *trust* for him, until the return of peace.

*JOHN BRADWELL*, the intestate, a native of *England*, died, at *Flushing*, in *Queen's* county, in *August*, 1812, intestate, without issue, leaving a widow, and a clear *personal* estate, after the payment of all debts, &c. of 6,219 dollars and 51 cents. *John* had four brothers, *Benjamin*, *Jonathan*, *Joseph* and *Peter*. He removed, with his brother *Benjamin*, from *England* to the *United States*, in 1802. *Benjamin* died a few years ago, in *New-York*, leav-

ing three sons, *Benjamin*, *William*, and *John*, the plaintiffs in this suit, natives of this state. *Jonathan* died in *England*, in 1802, leaving two children, who are still living there, named *Jonathan* and *Ann*; and the other brothers, *Joseph* and *Peter*, are, also, still living in *England*.

In *September*, 1812, the defendant took out letters of administration on the estate of the intestate, and paid to the widow one moiety of the estate, and to *Gibbons*, the guardian of *William* and *John*, two of the sons of *Benjamin*, the brother of the intestate, deceased, 539 dollars and 30 cents, being two thirds of one fourth of the remaining moiety, and was ready to pay the other third of the one fourth, to any person authorized to receive it for the other son of *Benjamin*, who was an infant; but he retained in his hands, as he insisted he had a right to do, the remaining three fourths of the moiety of the estate, to be paid to the two brothers of the intestate, and the children of the deceased brother, who were in *England*, and who claimed their distributive shares as next of kin to the intestate.

The plaintiffs filed their bill, claiming the whole of the moiety of the estate, and insisting that *Joseph* and *Peter*, and the children of *Jonathan*, being *alien enemies*, were not entitled to any portion of the estate.

The cause was heard on the bill and answer.

*Burr*, for the plaintiffs.

*Riggs*, contra.

THE CHANCELLOR. The plaintiffs demand not only their equal portion, but the whole moiety of the personal estate of the intestate, to the exclusion of others who are next of kin, in equal degree, because they were alien enemies at the time of the intestate's death. The intestate died without issue, and the statute of distributions, in such case, directs that a moiety of the personal estate shall go to the widow, and the

residue " shall be distributed, equally, to *every of the next of kin* of the intestate." The statute did not intend to limit the transmission of personal estate to such of the next of kin as were citizens, in imitation of the law of descents concerning real estate, but the personal estate was intended to pass to the next of kin, whoever, or wherever, they might be. The distinction between aliens and natives, as to the right of succession to chattels, does not exist. But it is urged that an alien enemy has no rights, and is incapable of acquiring any. This general proposition is not true, in the unqualified extent in which it has been laid down. By the modern law of nations, and by the law of the land, of which the law of nations is also a part, an alien enemy does not forfeit his rights of property. In many cases, he is entitled even to sue for his own rights, as when he is permitted to remain in the country, or is brought here as a prisoner of war, or when, perhaps, he is ordered out of the country in consequence of the war. He is recognised, in our courts, in his character of executor ; (*Brocks* v. *Phillips*, *Cro. Eliz.* 684. ;) and, in all cases, his property is protected and held in trust for him until the return of peace. This whole doctrine was examined and supported by authority, and admitted to be valid, in the cases of *Clarke* v. *Morey*, and of *Bell* v. *Chapman*, recently determined in the supreme court of this state. (10 *Johns. Rep.* 69. 183.) The policy of the law does undoubtedly place alien enemies under many disabilities, which, however, have been much diminished, or their severity mitigated, in modern times. As a general rule, alien enemies cannot sue in our courts while they are commorant abroad ; and, perhaps, contracts between them and our citizens, made *flagrante bello*, may be illegal and void, unless when made under the sanction of public authority. But I am not aware that the existing laws go further. They impose no forfeiture or confiscation of property ; they destroy no right, but only suspend the exercise of certain rights. It is for the sovereign power of the country to determine

when, and how far, in cases unprovided for by treaty, the rights and property of alien enemies shall be impaired by war. Without some special act of the government, an alien enemy is no otherwise affected, in his former capacity, as alien friend, to hold, acquire, and transmit, property, than in the cases to which I have alluded. If he should, by will, bequeath his goods and chattels in this state, or by deed, or writing, assign his *choses in action* to some alien friend, would not our courts give effect to those acts ? But I come to the very point before me, and say that an alien enemy does not lose his *capacity* to take personal property, by suc-cession, as next of kin. There is no instance in which such a disability has been declared. It would be repugnant to that spirit of mildness and moderation which now pervades the public law, as it is explained in the commercial codes, and in the writings of the most enlightened jurists. It is not within the reason, or the policy, of the rule of the common law, disa-bling aliens from taking real estate by descent ; that disa-bility, according to Sir *Matthew Hale*, (1 *Vent.* 417.,) is founded on this reason, that as the alien cannot keep the freehold, the law, *quæ nihil frustra*, will not cast it upon him. But an alien enemy *can* keep, and *does* keep, his per-sonal estate. All his goods, chattels, and credits, and all his civil capacities, as incident to personal property, are pre-served to him, safe and untouched, until the return of peace. If the sovereign sequesters the alien's property, (as has sometimes been done, in time of war,) yet the very meaning of sequestration is a taking in trust, subject to restoration. (*Dig.* 16. 3. 6.) When peace returns, the rights of the alien revive in their original force ; and, as a general rule, his debtor, whether that debtor be the public, or an indivi-dual, is answerable even for interest accrued during the sea-son of hostility ; for he has had, in the mean time, the enjoy-ment of the debt. If the debtor dies, or becomes bankrupt, his representative, in the character of executor, administra-tor, or assignee, holds the estate of the debtor, whatever it

may be, in trust, for the payment of the alien's debt, as well as the debts of other creditors. An alien is one of the next of kin, within the words of the act, though he is an alien enemy; and the policy of the law is fully and effectually answered by disabling the alien from demanding, and drawing out of the country, his distributive share during the existence of the war; all that the laws of war require is, that we should not benefit the enemy. Any further disability would be a useless relic of ancient barbarity.

In the present case, the aliens are not attempting to recover the property. They are not before the court. We have only their relatives, in equal degree, who are unkindly seeking to exclude them from the rights and ties of kindred. If the property is *forfeited*, by reason of the war, it is forfeited to the government, not to the next of kin; and this court cannot interfere to enforce any disability, or penalty, which may be attempted to be deduced from the laws of war.

I shall, accordingly, let the portion due to the next of kin, who are abroad, remain in the hands of the administrator, to be retained by him, in trust, until those next of kin are in a condition to assert their claim, and to litigate, if necessary, with their relatives who are now before the court.

With respect to the share of the infant, *Benjamin*, the administrator may pay it into court, or retain it, at his election, until a guardian, duly appointed, shall be ready to receive it.

Bill dismissed, with costs.(a)

(a) This decree was reversed, on appeal to the court of errors, on the 27th of *March*, 1815. The members of the court of errors were equally divided in opinion; all the *judges of the supreme court* were for the *affirmance* of the decree, which was reversed by the casting voice of the *President* of the court, (Lieut. Gov. *Tayler*.)