IN THE

## COURT FOR THE CORRECTION OF ERRORS,

IN

## THE STATE OF NEW-YORK,

IN MARCH AND APRIL, 1815,

---

WILLIAM BRADWELL *and* JOHN BRADWELL, *infants, by* THOMAS GIBBONS, *their guardian, and* BENJAMIN BRADWELL, *an infant, by* THOMAS GIBBONS, *his next friend,* } *Appellants.*

*against*

ELIPHALET WEEKS, *administrator, &c., of* JOHN BRADWELL, *deceased,* } *Respondent.*

THIS was an *appeal* from the court of chancery. *John Bradwell,* the intestate, a native of *England,* residing at *Flushing,* in *Queen's* county, *Long Island,* died, in *August,* 1812, intestate, without issue, leaving a widow, and a clear *personal* estate, after payment of all debts, &c., of 6,219 dollars and 51 cents.

The intestate had four brothers, named *Benjamin, Jonathan, Joseph,* and *Peter;* and, in 1802, he removed from *England,* with his brother *Benjamin,* and settled in this state. *Benjamin* died, about 10 years ago, in the city of *New-York,* leaving three sons, *Benjamin, William,* and *John,* natives of this state, appellants in this suit. *Jonathan,* brother of the intestate, died in

Where an *alien* dies in this state, intestate, during a war with his native country leaving *personal* property, his relations abroad, though next of kin, being *alien enemies* residing in the country of the enemy, are not entitled to distributive shares of the property, but the whole will go to his next of kin resident in this state. See S. C. *contra,* (1 *Johns. Ch. Rep.* 206.)

IN ERROR.
. . . . . .
ALBANY,
March, 1815.

BRADWELL
v.
WEEKS.

*England*, in 1802, leaving two children, *Jonathan* and *Ann*, who were still living; and the other brothers of the intestate, *Joseph* and *Peter*, were, also, still living in *England*.

In *September*, 1812, the respondent took out letters of administration on the estate of the intestate, and paid to the widow of the intestate one moiety of the estate, and to *Gibbons*, the guardian of *William* and *John*, the two sons of the intestate's brother *Benjamin*, deceased, 539 dollars and 30 cents, being two thirds of *one fourth* of the remaining moiety, and was ready to pay the other third of the one fourth, as the share of the other infant son of *Benjamin*, deceased, to any person legally authorized to receive it; but the respondent retained in his hands the other three fourths of the moiety of the intestate's estate, which he insisted he had a legal right to do, to be paid to the two brothers of the intestate, and to the children of the deceased brother, in *England*, and who claimed their distributive shares, as next of kin to the intestate.

The appellants filed their bill in the court below against the respondent, as administrator, &c., claiming the whole moiety of the personal estate of the intestate, and insisting that *Joseph* and *Peter*, the brothers of the intestate, in *England*, and the children of *Jonathan*, deceased, also living there, being *alien enemies*, war then existing between *Great Britain* and the *United States*, were incapable of taking under the statute of distributions of this state, and, therefore, not entitled to receive any portion of the intestate's estate.

This cause was heard on the bill and answer, when the court below pronounced, the 13th of *September*, 1814, the following decree : " That the plaintiffs' bill be dismissed with costs, to be taxed, to be paid to the defendant by *Thomas Gibbons*, the guardian and next friend of the infant plaintiff," &c. "That the defendant may, if he thinks proper, pay the distributive share of the intestate, which belongs to the infant *Benjamin*, who is without guardian, into the hands of the register or assistant register of the court, to be by him put out on real security, or invested in the *United States* stock, for the benefit of the infant, or his legal representatives, and to abide the further order of the court respecting the same. And that such payment, to the register or assistant register, shall be a discharge to the defendant of his trust, respecting the said distributive share of the intestate's estate."

The **Chancellor** assigned the reasons for his decree, which were the same as those expressed in the judgment of the court below. (See 1 *Johns. Ch. Rep.* 206.)

IN ERROR,
.......
ALBANY,
March. 1815.

BRADWELL
v.
WEEKS.

*Burr,* for the appellants. He cited 1 *Bl. Com.* 372. 1 *Hale P. C.* 95. *Calvin's Case,* 7 *Co.* 33. *Chitty's L. of N.* 2. 2 *Anst.* 263. 2 *Str.* 1082. 1 *Ld. Raym.* 283. *Doug.* 650. *Bynkershoek, Quæst. Jur. Pub.* lib. 1. ch. 7.

*Riggs,* contra. He cited *Parker's Rep.* 267., *Attorney General* v. *Wheeden and another.* 1 *Bos. & Pull.* 163., *Sparenburgh* v. *Bannatyne.* To show that the bill was defective, as not containing a sufficient allegation of the persons in *England* being *alien enemies,* he cited 2 *Anst.* 462. 543. 2 *Atk.* 397.

**Yates, J.** The question is, whether the appellants are entitled to a moiety of the intestate's *personal estate,* to the exclusion of two of his brothers, and the children of another deceased brother, who are admitted to be *alien enemies* at the time of the intestate's death.

The principle, that wars ought not to interfere with the *personal* property of an *alien,* in an enemy's country, or with the security and collection of debts, has, in modern times, gained ground in all civilized nations. The latest cases in the *English* courts concur in the opinion, that the ancient severities of war have been much mitigated by modern usages; this is to be attributed, in a great measure, to the more frequent intercourse between citizens of different nations, by means of commerce, the successful handmaid in securing an interchange of sentiments, whereby more liberal and enlarged views are necessarily introduced, contributing, in a great degree, to soften the estranged and cold feelings of nations towards each other, and thus promoting the security and happiness of individual members of every civilized community. Mankind have 'a relative connexion, and there ever must exist a dependence on each other, to which they are subjected by nature; and although nations may not be in the same situation with individuals, in that respect, yet, when there is an intercourse, they ought to be governed by the same common principles of moral obligation.

In our country, these enlightened and humane principles have

been recognised, as appears by the decisions of our courts, founded on the authority of the common law; and the law of nations. The principle is here well understood, that an enemy, under the protection of our government, can sue and be sued; and that the prohibition to an *alien enemy*, not in the country, to do the same, is temporary, and continues only during the existence of the war; and it is also a doctrine well established in the *English* courts.

In a late case, in chancery, (*ex parte Boussmaker*, 13 *Vesey*, 71.,) Lord *Erskine* declared, that the alien's right of action, in such case, was only suspended by the war; and if the contract was originally good, the remedy would revive on the return of peace.

I shall not controvert the correctness of the principle laid down by Sir *William Blackstone*, in his Commentaries, cited by the appellants; (1 *Black. Com.* 372.;) " That alien enemies have no rights, no privileges, unless by the king's special favour, during the time of war;" but, conformably to this doctrine, I think it may well be urged, in this case, that the benefit of the statute of distributions ought to be extended to the kindred of the deceased, notwithstanding their alienage, as a consequence resulting out of privileges granted to the intestate by our government before his death.

It does not appear that *John Bradwell*, the intestate, had become a naturalized citizen of the *United States*, but that he was an *Englishman* by birth; and that he, and his brother *Benjamin*, moved from *England* to the *United States*, in 1802. The inference, therefore, is, that he continued an alien, and that he resided in this country, before the war, as an alien friend, and, afterwards, during the war, as an alien enemy, under the protection of government, and in the enjoyment of privileges guarantied to him by the law of the land. *Vattel* (book iii. ch. iv. sect. 63.) says, " The sovereign declaring war, can neither detain the subjects of the enemy who are within his dominions at the time of the declaration, nor their effects; they came into his country on the public faith. By permitting them to enter his territories, and continue there, he tacitly promised them liberty and security for their return." And in ch. v. sect. 76., in the same book, he says, " War being now carried on with so much moderation and indulgence, safeguards are allowed to houses and lands possessed by foreigners in an enemy's country. For the same rea-

IN ERROR.
........
ALBANY,
March, 1815.

BRADWELL
v.
WEEKS.

sons, he who declares war does not confiscate the immovable goods possessed in his country by his enemy's subjects; in permitting them to purchase and possess those goods, he has, in this respect, admitted them into the number of his subjects.

In the case of *Clark* v. *Morey*, (10 *Johns. Rep.* 72.,) it is stated by the supreme court, that the evident construction of the act of congress, of the 6th *July*, 1798, is, that where an alien comes to reside here during peace, no letters of safe conduct are requisite, nor any license from the president; that the license is implied by the law and the usage of nations; that if he came here even since the war, a license would be implied, and the protection to him would be continued, until the executive should think proper to order him out of the *United States*.

In this case, it does not appear that the intestate has ever, in any way, been molested by any order of government, but has continued to reside here, by permission, as before stated, until his decease. I can see no reason why the rights he enjoyed, as to the destination of his *personal* property, if he had died during peace, should not (while he thus continued) be secured to him during war. If his relations abroad were entitled to a distributive share in the one case, they are equally entitled in the other. That they would have been permitted to take their shares before the war, in case of his death, will not be questioned. Every member of this court must know, that the benefit of that rule of law in *England* has frequently been experienced by citizens here. They ought not, perhaps, to be allowed to recover the property while the war continues; and, in that respect, ought to be placed on the footing of an alien *enemy*, who is a creditor, not resident here, and, consequently, incapable to prosecute for his debts. But the permission given to the alien to remain, must, in case of his decease, during that period, secure to his alien relatives the ability to take, and, on the return of peace, to recover their shares of his *personal* property, according to the statute of distributions, in the same manner as if no war had intervened. This cannot be deemed a violation of the principles laid down in the books, that alien enemies have no rights, no privileges, unless by special favour of the government of the country; because, it is a consequence necessarily attached to the special favour granted, of remaining in the country during the war.

I am aware that this is extending the consequential right of

protection in time of war further than appears heretofore to have been done; for, by the books, it is not carried beyond the right of suing for debts; but it is probable that this question has never been brought up; I believe no case, to that effect, can be found. It is not unreasonable, therefore, to infer, that no claim like that of the appellants has ever before been interposed.

Admitting, however, for a moment, that this reasoning is not warranted by the facts in the case, because it does not appear, affirmatively and explicitly, that the intestate was an *alien enemy* at the time of his death, nor that he remained here by permission of government, (although there can be no doubt of it, according to the construction given to the act of congress, in *Clark* v. *Morey*, before stated,) yet, in order to take a more full and satisfactory view of the subject, I shall proceed to examine the claims of the appellants on the ground urged by their counsel.

It has been stated that the people have no right on the ground of forfeiture, and ought not to interfere with this property, because the claimants abroad having no privileges, being alien enemies, could not take it.

It must be admitted, that the principles, in relation to *real* estate, as to the alien's taking and holding, until office found, cannot apply to the present case.

An alien can take *personal* property with him, when ordered out of the country; but the soil is a portion of its dominion, and allegiance to the government, on the part of the owner, cannot be dispensed with; they are inseparable, and the safety of every community forbids the introduction of a measure which would inevitably give a permanent influence to persons not interested in its destinies.

*Blackstone* (1 *Bl. Com.* 371.) says, if an alien could acquire a permanent property in lands, he must owe an allegiance equally permanent with that property, which would probably be inconsistent with that which he owes to his own natural liege lord; besides that, the nation might, in time, be subject to foreign influence.

The property in question is *personal*, and the peculiar situation of it arises out of a state of hostility, and never can enure to the benefit of the appellants, so as to give them the exclusive right to it. The disability (if it exists at all) is created for the advantage and security of the government, who ought, per-

IN ERROR,
.......
ALBANY,
March, 1815.

BRADWELL
v.
WEEKS.

haps, to retain it in the country during the existence of the war. But, it is said, the court, in the decision of this cause, ought to be governed by *policy ;* and the relative situation of the claimants has been adverted to, and the exclusive ability of the appellants to render essential services to the country, while in a state of war, has been urged in their favour.

In *Cornu* v. *Blackburne,* (*Doug.* 641.,) Lord *Mansfield* declared, that it was sound policy, as well as good morality, to keep faith with an enemy in time of war, and that a contract which arises out of a state of hostility, ought to be governed by the law of nations, and the eternal rules of justice.

This, indeed, is not a contract; but, according to the view first taken of the subject, it would be an advantage claimed, in consequence of an implied permission given to the intestate, and could not, according to the rules of justice, be extended to the appellants, nor enforced by the people.

I believe it will be admitted, that the soundest policy of every government, in relation to questions of this kind, is to observe good faith towards foreigners of every description; more especially, if they continue their residence by permission of government, during a war with their country, and not to allow such permission to entrap them, or to produce a disposition of their property different from what would have taken place in a state of peace, and thus suffering manifest injustice to be exercised towards their representatives abroad.

To encourage a foreigner to remain with us in time of peace, with an understanding that, according to the law of nations, in the event of his death, his personal estate shall go to his representatives abroad, although aliens ; yet if, unfortunately, a war intervenes, during which he dies, to deprive the same representatives of this property, notwithstanding the permission of government to the intestate, to remain in the country until his decease, appears to me to be repugnant to justice and humanity.

It, assuredly, must operate as a direct discouragement to that commercial intercourse, so requisite to promote the happiness and prosperity of our country. According to the view, then, which I have taken of the subject, true policy would lead to a course, securing to the *alien* representatives, abroad, the ultimate enjoyment of the *personal* property of their deceased relative.

I am, accordingly, of opinion, that the next of kin of the intestate, residing in *England,* are entitled to their distributive shares

of his personal estate ; and that the decree of the court of chancery ought to be affirmed.

VAN NESS, J., SPENCER, J., and THOMPSON, Ch. J., (PLATT, J., being absent) declared themselves to be of the same opinion.

P. W. RADCLIFF, STEWART, ATWATER, TIBBITS, VAN SCHOONHOVEN, VANBRYCK, and WENDELL, Senators, were also of the same opinion.

ARNOLD, BRICKNELL, BISHOP, BLOODGOOD, BLOOM, CANTINE, CLARK, PRENDERGAST, ROSS, SWIFT, and TABOR, Senators, were of opinion that the decree of the court of chancery ought to be reversed.

The members of the court, who were present, being thus equally divided in opinion, the PRESIDENT (*Lieut. Gov.* TAYLER) declared his opinion, that the decree of the court below ought to be reversed.

27th March,
1815.

It was, thereupon, " ORDERED, ADJUDGED, and DECREED, that the decree of the court of chancery be reversed, and that the respondent pay to the appellants 87 dollars and 96 cents, being the amount of costs ordered and decreed by the court of chancery to be paid by the appellants to the respondent, and which has been paid accordingly ; and that the respondent do account, under oath, before one of the masters of the court of chancery, for the personal estate of *John Bradwell,* deceased ; and that the said respondent be allowed out of the said estate, the taxable costs of his defence in this suit, in the said court of chancery, and on this appeal, and all necessary disbursements by him made, prior to the commencement of the said suit ; and that he pay over the balance to the appellants, or to the guardians of such of them as may be then under age, in equal proportions ; and that the court of chancery take all necessary measures for carrying this order into execution," &c.

.Judgment of reversal.(*a*)

(*a*) The parties, who were *aliens,* it is understood, applied to the circuit court of the *United States,* and obtained an *injunction* in the cause, before any proceedings were had on the *remittitur* to the court of chancery; so that the question will, probably, be decided, in the last resort, by the supreme court of the *United States.*