(Surrogate's Court, Westchester County. August, 1895.)

1. EXECUTORS AND ADMINISTRATORS—APPOINTMENT—CHANGING COUNTY LINES.
   Code Civ. Proc. § 2479, provides that where territory is transferred from one county to another the jurisdiction of the surrogate's court of each of the counties affected thereby to take the proof of a will or to grant letters depends on the locality, "when the petition is presented," of the place where the property of the decedent is situated, or the event occurred which determines jurisdiction, and that "if, before the transfer of the territory, letters had been granted on the ground that the decedent died or resided within the county, the surrogate's court from which they were issued has exclusive jurisdiction." *Held*, that the phrase, "when the petition is presented," referred to the time when the petition came before the surrogate on the return of the citation, and not to the time when it was filed.

2. INTERMEDIATE APPEALS—DECISION PRO FORMA—EFFECT.
   The decision of the general term of the supreme court on appeal from an order made by a justice of that court, entered pro forma, without argument or consideration, and solely for the purpose of hastening a determination by the court of appeals, will not be regarded by the surrogate's court as binding on it.

3. CONSTITUTIONAL LAW—POWERS OF LEGISLATURE—CHANGING COUNTY LINES.
   Laws 1895, c. 934, incorporating a part of the county of Westchester into the city of New York, violates the provisions of the state constitution which recognize the existing counties, apportion members of the assembly to the several counties, and divide the state into senatorial districts, but provide that in the formation of a district no county shall be divided.

4. SAME—CREATING NEW COUNTIES.
   The provision of the constitution of New York giving to the legislature the power to divide counties and erect new counties does not authorize it to change the boundary lines of counties.

Applications by Margrete Jane Fifer and Amelia Sullivan respectively for letters of administration on the estate of Patrick J. McGinness, deceased.

Seward Baker, for Amelia Sullivan, creditor.
David Switz, for Margrete Jane Fifer, sister.

SILKMAN, S. On May 11, 1895, one Amelia Sullivan filed a petition showing that she was a creditor of the decedent, Patrick J. McGinness, late of the town of Westchester, in the county of Westchester, and praying for a citation directed to all persons having a prior or equal right with the petitioner to show cause why a decree should not be made granting letters of administration to her. On that petition a citation was issued, returnable on the 8th day of July, 1895. On the 10th day of June, 1895, a petition was filed by Margrete Jane Fifer, a sister of decedent, praying for letters of administration. Upon the return of the citation issued upon the creditor's application, it was ordered that letters of administration issue to Margrete Jane Fifer upon the payment of the costs of Amelia Sullivan within 10 days, and upon default letters of administration were directed to issue to said Amelia Sullivan. The costs were paid according to the terms of the order, and Margrete Jane Fifer now asks that letters of administration be issued to her.

The attention of the surrogate is now called to chapter 934 of the Laws of 1895, which became a law on June 6, 1895, and which purports to set off that part of the county of Westchester to the city of New York which includes the town of Westchester, where the decedent resided and died. It is provided by section 2479 of the Code of Civil Procedure that: ·

"Where a new county has been heretofore or is hereafter erected or territory has been heretofore or is hereafter transferred from one county to another, the jurisdiction of the surrogate's court of each of the counties affected thereby to take the proof of a will or to grant letters depends upon the locality, when the petition is presented, of the place where the property of the decedent is situated, or where the event occurred, as the case may be, which determines jurisdiction."

The section further provides that:

"If before the erection of the new county, or the transfer of the territory, letters have been granted upon the ground that the decedent died or resided within the county, the surrogate's court from which they were issued has exclusive jurisdiction of the estate and of all matters incidental thereto."

The section then provided for the certification of any paper filed, entered, or recorded in the surrogate's court where the decedent died or resided in a place embraced within another county, and for the filing, entering, and recording of such certified copies in such other county with like effect as the originals. It is clear that the event referred to in the section is the event of death, and the death here occurred in the town of Westchester, which has been set off under the annexation act. The language of the section is not well chosen, and there is some doubt as to the meaning of the words, "when the petition is presented,"—whether the word "when" therein used refers to the date when a petition is filed, or the date when it is acted upon by the surrogate by the issuance of letters. The date of the filing would naturally be considered the meaning were it not for the sentence following the one in which such language is used, which is, "if before the erection of the new county, or the transfer of the territory, letters have been granted," etc. This latter language compels us to assume that what the legislature meant by the use of the word "when" was the time the petition came before the surrogate upon the return of the citation, and was acted upon by him by the issuance of letters. Adopting this construction, the entire section is intelligible. It was evidently framed to fit such a case as the present one. The original petition in this case was filed on May 11th, before the passage of the act of the legislature referred to, and upon the return of the citation letters of administration could have been issued to any one having priority over the creditor without the necessity of filing a new petition; the petition filed by Margrete Jane Fifer, therefore, may be disregarded. The petition filed May 11th was not, however, presented to the surrogate for determination until the 8th day of July, when the citation was returnable, which date was after the passage of the annexation act. I am therefore of the opinion that this court is ousted of its jurisdiction, unless it is found that the legislature clearly exceeded its constitutional power in transferring a part of the county of Westchester to the county of New York. The

consideration of this constitutional question is fraught with embarrassment at the very threshold. The issue has been tried in the supreme court by Justice Dykman, who has upheld the constitutionality of the law; and his decision has been affirmed by the general term of this department. Under ordinary circumstances it would be incumbent upon this court to follow the decision of the general term without further consideration, were it not for the fact that the affirmance of the general term was pro forma, and without argument or consideration, and for the avowed purpose of hastening a determination by the court of last resort. The issue, therefore, stands substantially as if determined by Justice Dykman alone, for whose opinion this court has great respect, but by whose judgment its conscience is not necessarily bound.

The consideration of the question is also embarrassed by the fact that in 1873 the legislature passed a somewhat similar act, annexing a part of Westchester county to New York county, the constitutionality of which does not seem ever to have been challenged. It was subsequently put beyond question by the amendments to the constitution in 1874. However, bearing in mind the language of Owen, J., in State v. Pugh, 43 Ohio St. 98, 1 N. E. 439, where he says: "When the unconstitutionality of an act is very clear to this court, it is clothed with no higher function, it is invested with no more exalted duty, than to say so with promptness. To surrender our convictions to a mere sentiment, or to an apprehension that it may seem an arrogant assumption of superior wisdom to declare a legislative enactment invalid, would be a weak disregard of a plain duty, as dangerous to the state as the void enactment itself;" and also the words of Justice Andrews in People v. Rice, 135 N. Y. 473, 31 N. E. 921: "The legislature and the courts are alike bound to obey the constitution, and, if the legislature transgresses the fundamental law, and oversteps in legislation the barriers of the constitution, it is part of the liberties of the people that the judicial department shall have and exercise the power of protecting the constitution itself against infringement,"—I am bound to declare my conclusion that the legislature exceeded its power in changing the boundaries of the counties of New York and Westchester, and that it is sufficiently plain to warrant my doing so.

Counties, as territorial divisions, antedated the first constitution of the state of New York, adopted in 1777, and by that document were recognized, and the legislature therein provided for was chosen from the several counties and districts (districts made up of different counties). The people, through its patriotic representatives, the framers, surrendered to such legislature "the supreme legislative power within this state." This supreme power was subject to such restrictions as may be found in direct terms or by implication. "A restriction may be in expressed terms or by implication." Rumsey. v. People, 19 N. Y. 41. The fact that the counties existed prior to the constitution, and that they were therein recognized for the purpose of dividing the state into senate and assembly districts, seems conclusive that there was no inherent right in the legislature to interfere with county lines, and this proposition is well recognized.

Strong, J., says, in the case of Rumsey v. People, referring to the constitution of 1846: "Under this constitutional grant (for I consider it as such, and not as a mere recognition of an original inherent right) the legislature acquired the power to erect new counties." In the case of People v. Draper, 15 N. Y. 532, Denio, C. J., says:

"It cannot be denied that an act of the legislature which should propose to abolish counties would be hostile to the arrangements of the constitution. There are a great many provisions of that instrument to the execution of which counties are indispensable."

If the legislature had no inherent power under the general surrender of legislative authority to it, we have a right to assume that the constitution gave it, in respect to the subject of counties, all the power that the people intended it should have. If there was no restriction intended, and the legislature had general power, the provision for erecting new counties would be a useless waste of words. That power in the original constitution is given in the following language:

"That it shall be in the power of the future legislatures of this state, for the convenience and advantage of the good people thereof, to divide the same into such further and other counties and districts as to them shall appear necessary."

Where power to do a particular thing is specially given, the delegation of such special powers will be presumed to include all the power intended, and to restrict the exercise of general powers. The framers of the constitution appreciated that a portion of the state was not embraced in any county, and that some of the original counties were enormous in extent, and, as their population increased, the convenience of the good people thereof would require them to be subdivided, and new counties erected, and so provided for it. There is not a suggestion in the language used that they ever had in mind the enlargement of any of the original counties. The whole intent, meaning, and purport of the words is the power to subdivide. "To divide the same into such further and other counties and districts" cannot be construed to mean the power to rearrange county lines. To "divide" means to make something into smaller parts, and not to enlarge. The plain meaning of the language used must be followed. Bronson, C. J., in the case of Oakley v. Aspinwall, 3 N. Y. 547, says:

"It is not for us, but for those who made the instrument, to supply its defects. If the legislature or the courts may take that office upon themselves, or if, under color of construction, or upon any other specious ground, they may depart from that which is plainly declared, the people may well despair of ever being able to set a boundary to the powers of the government. Written constitutions will be worse than useless."

It will also be seen that the framers of this first constitution had in mind representation in the legislature proportionate to the population of the several legislative districts, and so fixed the number of representatives from the several counties and senate districts that the power to change such representation was not delegated to the legislature until the census should have been taken, seven years after the close of the pending war, and then the legislature was only authorized to apportion members of the assembly and senators among

the counties and districts in order to make a just apportionment. Thus early did the people restrict the legislature. Had the legislature the power to alter county lines by taking from one county and adding to another, the whole scheme of just and proportionate representation, so carefully provided for in this first constitution, could have been thwarted. It would be unreasonable to suppose that the framers of the constitution would put it in the power of the legislature to destroy a plan of representation which had been carefully devised.

Having referred to the first constitution, a brief reference to the ones intermediate that and the one of 1894 may be proper. The amendments to the constitution in 1801 relate to the number of the members of assembly and senate. No further power is given to the legislature in respect to the alteration of county lines. It does, however, provide that the legislature shall apportion the members of assembly among the several counties of the state, and also provides that nothing therein contained shall prevent the legislature from allowing one member of the assembly to each county theretofore erected. The constitution of 1821 recognizes the existence of counties, and provides for senate districts, to consist of whole counties, provision being made that no county shall be divided in the formation of the senate district. It is also provided that every county theretofore established should be entitled to one member of the assembly, and no new county should thereafter be erected unless its population should entitle it to a member. No other or further power is given to the legislature in respect to county lines. We next come to the constitution of 1846, in which again we find the counties recognized and the senate districts all bounded by county lines, the people having in view the division of the state into senate districts as equal as might be in population without the alteration of county lines. It provides that such districts shall remain unaltered until another enumeration. It provides that no county shall be divided in the formation of a senate district. It provides for the apportionment of members of the assembly to the several counties, and, where a county is entitled to more than one assemblyman, the board of supervisors of such county shall apportion the county into assembly districts. It also provides that no new county shall be erected unless its population should entitle it to a member of the assembly. The amendments to the constitution in 1867, so far as they affect the subject under discussion, were defeated by the people. The next amendment was in 1874, when the constitution was amended, providing for the number of members of the assembly, and directing their apportionment among the several counties of the state by the legislature according to the number of the inhabitants, and directing that, where a county was entitled to more than one assemblyman, the board of supervisors should apportion districts; that every county, except the county of Hamilton, should always be entitled to one member of assembly; and no new county should be erected unless its population should entitle it to a member. It is provided that the county of Hamilton should elect with the county of Fulton, and that the legislature may abolish the said county of Hamilton, and annex the

territory thereof to some other county. The provision that senate districts should be bounded by county lines is changed to lines of assembly districts. It will be noticed that for the first time the people surrendered the power to annex one county to another, and only did this in the case of the county of Hamilton.

Under the constitution of 1846 was decided the case of People v. Draper, above cited.

"The counties and cities must not only be preserved, but the legislature must do nothing respecting them which will render them less suitable for the purposes for which they are recognized and employed by the constitution. All the arrangements to which the counties and cities are subservient or instrumental, or in which their agency is contemplated, must have their free course unobstructed and unincumbered by legislation."

Under the law as laid down by Judge Denio, the county of Westchester could not be abolished, and, if the county could not be abolished, it follows that no part of it could be.

The constitution of 1894 makes no material departure from the scheme of previous ones in respect of making counties the territorial divisions of the state, by which senate, assembly, and judicial districts are arranged. The senate districts are divided by county lines, and members of assembly are apportioned among the counties, due regard being had to equality according to the population of the several counties. The authority to bound senate districts by assembly districts is abolished; judicial districts and departments are bounded by, or to be bounded by, county lines.

If there is any feature of the constitutional history of the state that stands out more prominent than another it is the fact that the county is the unit upon which all representation is based, legislative and judicial. The destruction of this unit is not contemplated, except by dividing it, and the erection of two or more units in the place of one. The power to alter county lines by taking from one county and adding to another would mean the power to defeat the provisions for equality of representation. The reason for adopting the county as the unit is plain. Each has its own peculiar institutions, interests, and traditions, and the people of each have unity of interests, and have become influential by unity of action. The remarks of Mr. Root at the last constitutional convention are appropriate. He said:

"The habits of our people, their traditions, their best and noblest sentiments, are embodied in the pride which they feel in the counties of their birth and after-life. These counties originally meant something; they still mean something. Destroy them, in order that there shall be political divisions at all, in order that the state may be districted for senators and assemblymen, will create new lines, new divisions, in which people are to create new friendships, which any future convention may destroy. You destroy an institution of immense and immemorable value, and create another, which in the future can be destroyed by some future convention. No, sir. I am satisfied, and I believe all the people on this side of the house are satisfied, that the people of the state do not wish to destroy their county lines in the distribution of senators and assemblymen."

Westchester county, as it existed on January 1, 1894, is a necessary part of the arrangements of that instrument, and is employed for the purpose of completing the scheme of senate, assembly, and ju-

dicial districts, and under the authority of People v. Draper the legislature cannot interfere with it.

It may be said that the power to divide counties and erect new counties exhibited an intention to permit the destruction of county lines, county interests, and county sentiments. Not so; such power was given only to permit a county to be divided into two or more where the original county had grown too large for the convenience of the people. If we give to the words of the constitution their strict meaning, and do not give to the word "divide" the meaning of "annex" or "enlarge," we have a consistent document, without any possible danger of the design and purpose of equal representation being frustrated. Dividing a county and the erection of a new county thereby cannot violate the provisions as to senate districts or judicial districts being bounded by county lines, for both counties would still remain in the same senate and judicial district. And as to assembly districts, it is provided that no county can be erected unless it shall have sufficient population to entitle it to a member; and for the purpose of enabling a county to be divided and a new county set off without violating the provisions of section 5 of article 3, which provides for the apportionment of members of the assembly, and which provides that no town shall be divided in the formation of an assembly district, this provision is inserted: "Nothing in this section shall prevent the division at any time of counties and towns and the erection of new towns by the legislature." This clause is plainly for the purpose of enabling the legislature, where an apportionment has been made by the supervisors, and their power expended not to be exercised again until another enumeration and apportionment, and where a new county is to be erected, to rearrange assembly districts and town lines which may become necessary in adjusting the boundary between the new and old counties. The clause cited is not found in the section relating to senators, nor in the article relating to the judiciary. It must, therefore, relate to assembly districts, and, to be consistent with other portions of the instrument, can only have the meaning indicated. Whether I am right or not in the conclusion that there is a clear limitation in the constitution of the power of the legislature to alter county lines, except to divide a county and erect a new county therefrom, there is a clear violation of the spirit and language of the document. By article 6, § 1, the present judicial districts of the state are continued, and cannot be altered until 1905, when the next enumeration takes place. The present justices are continued in office for their respective terms, together with the judges transferred by the fifth section of the same article, and of twelve additional justices, who shall reside in and be chosen by the electors of the several existing judicial districts,—three in the First, three in the Second, and one in each of the others,—and of their successors, such successors to be elected by the electors in their respective judicial districts. The people of the state have not surrendered to the legislature the power to regulate its judiciary, or the jurisdiction thereof, except as expressly provided. The number of justices in the several districts has been fixed with due regard to the population and territory. If the legislature has the power to take territory

from one district and add to another, the scheme of the constitution is destroyed.   If it is possible to annex part of the county of Westchester to the city of New York, it must be equally possible to annex the whole.   In fact the Second judicial department might be annexed out of existence, leaving an army of supreme court justices, county judges, and surrogates with no jurisdiction except to receive their salaries, which are guarantied by the constitution itself.   Again, the judicial districts are continued until changed as authorized, which cannot be before the next enumeration in 1905.   The new justices are to be elected by the several districts as they existed at the time of the adoption of the constitution by the electors of the several districts.   The framers of the constitution intended that the people should have a voice in selecting those who would be called upon to judicially pass upon their rights.   The annexation act would destroy this constitutional right.   Actions arising between residents of the town of Westchester in the supreme court are triable in the county of New York before justices in whose selection neither of the litigants could have any voice.   The judicial districts cannot be altered by the legislature.   See People v. Board of Aldermen (Gen. Term, First Dept., Aug., 1895) 35 N. Y. Supp. 817.   If the annexation act is valid, we have this anomalous condition: The people of the annexed territory, for the purpose of voting for supreme court justices, would be in the Second judicial district, while all their actions would be triable in the First judicial district, under the provisions of the Code. This condition of affairs is as illegal as it is unreasonable.   The case of Lanning v. Carpenter, 20 N. Y. 447, seems to be sufficient authority for the conclusions that I have reached.   In that case, Denio, J., said:

"If we bear in mind that it is established by the constitution that no county shall be divided in the formation of a senate district, and that the judicial districts are always to be bounded by county lines,—that is, to consist of whole counties, and never of fractional parts of counties,—we shall have a view of all the constitutional provisions bearing directly upon the case."

In that case the court held that the act creating the county of Schuyler by setting off parts of the counties of Steuben, Chemung, and Tompkins was unconstitutional, for the reason that part of the new county fell within one senate and judicial district, while the other part fell within another.   There are other considerations which affect the validity of the act of 1895, but enough has been said to justify me in retaining jurisdiction of all matters as if chapter 934 of the Laws of 1895 had not been enacted.   Letters granted.