In the Matter of the Judicial Settlement of the Account of CENTRAL UNION TRUST COMPANY, as Executor, etc., of AUGUST J. ROECK, Deceased.

Surrogate's Court, Bronx County, July, 1922.

Executors and administrators — bequests to alien enemies — right of legatees to take subject to power of alien property custodian — privilege granted aliens different as to real estate.

Subject to the rights of the alien property custodian non-resident enemy aliens residing in an enemy country are entitled to legacies of personal property under the will of a resident decedent.

The will of decedent, who died in July, 1917, a resident of this country, made certain bequests and devises to two of his sisters. At the time of his death the survivor of said sisters and the surviving children of the other sister, who died in Germany in 1915, resided in and were citizens of the empire of Germany. The executor desires to have its accounts relating to the personal property of the decedent judicially settled. Held, that there is a difference with respect to the privilege granted to aliens between those affecting real property and those affecting personalty and that alien enemies are entitled to receive their legacies subject to the rights of the alien property custodian.

So held, as against the contention of testator's widow and of his son, that the surviving sister of testator and the surviving children of the sister who predeceased him being alien enemies of the United States had lost all their right, shares and interest in the decedent's estate and any legacies under his will, and that as to the moneys bequeathed to them the decedent died intestate.

PROCEEDING to settle accounts of executor.

*Black, Varian & Simon,* for executor.

*Adolph E. Gutgsell,* for contestants.

SCHULZ, S. On September 21, 1900, the decedent executed a last will and testament in which, among other dispositions of his property, he made certain bequests and devises to two of his sisters residing in the empire of Germany. Thereafter, and on May 12, 1905, and August 28, 1913, respectively, he executed codicils thereto which, except that they ratified and confirmed his will, are not of importance in this controversy.

One of the sisters mentioned died in Germany on May 31, 1915, leaving her surviving four children. The testator departed this life on July 23, 1917, and the documents heretofore referred to were, by decree of this court dated September 13, 1917, duly admitted to probate as his last will and testament. At the time of his death the surviving sister and the nephew and nieces, being the surviving children of the deceased sister, resided in Germany, and it is not disputed that they were citizens of the empire of Germany.

The executor now desires to have its account, which refers to personal property of the decedent only, judicially settled.

The decedent also left him surviving a widow and one son, and they have filed objections to this account in which they urge that at the time of the decedent's death the sister, nephew and nieces aforesaid, being alien enemies of the United States, resident in an enemy country, have, for that reason, lost all their rights, shares and interests in the decedent's estate and any legacies bequeathed by the decedent's will and that the decedent has died intestate as to the moneys bequeathed to them.

The question presented, therefore, is whether these enemy aliens residing in the country of the enemy at the time of the death of the decedent may, under our laws, take the legacies of personalty made to them or whether, as to such legacies, the decedent died intestate and the amounts bequeathed are distributable to the contestants as the widow and next of kin of the decedent.

No doubt there was a time long past when enemy aliens in some countries were treated with extreme harshness; when their goods and property were confiscated and they themselves imprisoned or destroyed. The closer association of nations and the more intimate contact between their subjects resulting from economic causes, commerce and the necessities of trade, in modern times, have caused a change in the attitude which governments generally assume toward the persons and property of subjects of enemy nations. *Kershaw* v. *Kelsey,* 100 Mass. 561; *Clarke* v. *Morey,* 10 Johns. 68, 72; *Brown* v. *United States,* 8 Cranch, 110.

As was said by Chief Justice Marshall in *Brown* v. *United States, supra:* " That war gives to the sovereign full right to take the persons and confiscate the property of the enemy wherever found, is conceded. The mitigations of this rigid rule, which the humane and wise policy of modern times has introduced into practice, will more or less affect the exercise of this right, but cannot impair the right itself. That remains undiminished, and when the sovereign authority shall choose to bring it into operation, the judicial department must give effect to its will. *But until that will shall be expressed, no power of condemnation can exist in the Court.''* Italics are mine.

It was early recognized that it would be unjust and unreasonable to encourage the subjects of one nation to come to other lands and by their industry and resources assist in developing them and yet subject such persons to the great danger of having their property confiscated and their lives forfeited, if, perchance, war should arise between their own nation and that of their sojourn. This is true particularly in our country whose growth and progress is due

largely to immigration, and is the more apparent when one remembers that such an alien cannot protect himself by becoming a citizen, even if he wished to do so, without some years of residence here.

On the other hand, it is clear that if alien enemies residing in the country of the enemy were entitled to receive property which is within the jurisdiction of this government, while a war is in progress, such property might inure to the benefit of the enemy nation and be used against us. Hence, while war itself does not result in a confiscation of the property of such alien enemies, the government usually does protect itself against the danger which might arise if such property were turned over to such aliens during the pendency of a war. An example of legislation having this purpose is found in the Trading With the Enemy Act (U. S. Comp. Stat. 1918, §§ 3115½a–3115½cc) which provides for the holding of such property by an official known as the alien property custodian. Legislation of the kind stated indicates that the policy of the government is conservation and not confiscation.

It is urged that there is no question of confiscation involved in this matter, but only of a refusal to permit an alien enemy, if resident in the enemy country, to take by bequest. If the governmental policy, however, is not to deprive such enemy aliens of property actually owned by them before the war begins, it seems logical to assume that the same policy exists as to rights which had been granted and which existed prior to the war, and of these the right to take by bequest was one. *Meakings* v. *Cromwell*, 5 N. Y. 136; *Beck* v. *McGillis*, 9 Barb. 35; *Marx* v. *McGlynn*, 88 N. Y. 358.

Again, before the war the decedent, a citizen of this country, was privileged under our laws to make the bequest stated and the same would have been valid and enforcible if he had died before the war. These rights are not abridged simply by the declaration of war itself, because the settled policy of the government is to impair as little as possible the private rights of citizens by national differences. *Sands* v. *N. Y. Life Insurance Co.*, 50 N. Y. 626; *Brown* v. *United States, supra.* Nor did the fact that the bequest became operative during the war violate the Trading With the Enemy Act. *Matter of Kielsmark's Will*, 188 Iowa, 1378; *Matter of Gregg's Estate*, 266 Penn. 189. If, therefore, these rights have been taken away during the war, we must look for some statute so providing, and if there is none, for some adjudication which has established such to be the law and hence has the force of a statute to that effect.

So far as devises of real estate are concerned, the statute makes

provision, for it specifically says that " alien friends are empowered to take, hold, transmit and dispose of real property within this state in the same manner as native born citizens " (Real Prop. Law [Laws of 1909, chap. 52; Cons. Laws, chap. 50], § 10), and it has been held that, therefore, alien enemies are excluded (*Techt* v. *Hughes*, 229 N. Y. 222; cert. denied, 254 U. S. 643), but as to bequests of personalty or the distribution thereof under the Statute of Distributions, no such statutory limitation exists. Decedent Estate Law (Laws of 1909, chap. 18; Cons. Laws, chap. 13), § 98. There is a difference with respect to the privilege granted to aliens between those affecting real property and those affecting personalty. *Beck* v. *McGillis, supra; Meakings* v. *Cromwell, supra; Marx* v. *McGlynn, supra.*

I am satisfied that the general policy of the government has not been to confiscate personal property of aliens either resident here or residing in the country of the enemy; and have found some authority in other states and in the federal court for holding that non-resident enemy aliens residing in the enemy country are entitled to legacies of personal property in this country under wills of resident decedents subject to the rights of the alien property custodian (*Matter of Kielsmark's Will, supra; Matter of Gregg's Estate, supra; Fairfax* v. *Hunter*, 11 U. S. 603, 619, citing *Attorney-General* v. *Wheeden & Shales*, Parker's Exch. 267), and I would find no difficulty in so holding were it not for two decisions which are urged upon me as precedents, one of which it is suggested is conclusive upon the question involved. These are *Techt* v. *Hughes, supra*, and *Bradwell* v. *Weeks*, 13 Johns. 1.

In *Techt* v. *Hughes, supra*, the right of an alien enemy to take real estate under the last will and testament of her deceased husband was involved, and the Court of Appeals held that if it were not for treaty rights existing between the two governments at war, the devisee by reason of being an alien enemy could not have enjoyed the benefit of the devise. This case, however, is readily distinguishable from the one now under consideration for the reason already stated that it involved real estate.

*Bradwell* v. *Weeks, supra*, presents a greater difficulty. There the decedent, a resident of the state of New York, died intestate, personal property only was involved and it was adjudged that the next of kin being aliens resident in the enemy country, could not take, and that the property was distributable to resident next of kin of the decedent.

That this case is very close to the one now under consideration cannot be denied, and I am confronted with the question whether

I shall follow my own judgment, fortified as it appears to be by some decisions in other states and in the federal court, or shall regard *Bradwell* v. *Weeks, supra,* as a controlling precedent and follow it regardless of the circumstances under which it was rendered, the policies of the state and federal governments, as I believe them to be, and my own conclusions in the matter. I might attempt to distinguish the pending matter from *Bradwell* v. *Weeks, supra.* It is true that in the latter case the decedent did not appear to be a citizen and died intestate, whereas in the matter under consideration the decedent's citizenship is not disputed and he did not die intestate. Such an attempted distinction, however, would be begging the question because I do not believe that there is a material difference in principle.

The doctrine of *stare decisis,* derived from the legal maxim, *stare decisis et non quieta movere,* and the rule of adherence to precedent, are well established in our law. I recognize, and have always followed, the rule that a court, especially one of first instance, should follow precedents laid down by courts of appellate jurisdiction and should never, unless the most unusual circumstances exist, presume to follow its own conclusions when an appellate court has decided the question to the contrary. The consensus of opinion is that the stability of our laws is dependent upon adherence to precedent, the theory being that in the last analysis greater justice is done by following a precedent which is known and understood, even if its correctness be subsequently doubted, than by enunciating a contrary principle which would unsettle the law.

It cannot be questioned that where a determination has been reached by an appellate court, and the reasons for the result obtained are stated, and show that the question has received careful consideration and is the result of deliberation, it should be followed, particularly where the principle enunciated has been the basis of other decisions and has been recognized by other courts, and where a contrary decision would tend to interfere with vested rights. *Baker* v. *Lorillard,* 4 N. Y. 257, 261; *Wayne County Savings Bank* v. *Low,* 6 Abb. N. C. 76; *Leavitt* v. *Blatchford,* 17 N. Y. 521, 533; *Rumsey* v. *N. Y. & N. E. R. R. Co.,* 133 id. 79, 85.

Is the converse of this proposition true? Is a court absolutely bound to follow a precedent in which no opinion was rendered giving the reasons for the conclusion reached, which does not appear to have been the result of examination, consideration and deliberation, which has not been followed or recognized by other courts in this state or elsewhere, where a contrary decision will not tend to create confusion as to vested rights and where the

conclusion itself appears to be against the general policy of the government when it was rendered and opposed to such policy when the question again arises? If so, then *Bradwell* v. *Weeks*, *supra*, is, in my opinion, determinative of the question now presented.

In *Gifford* v. *Livingston*, 2 Den. 380, 392, it was held: " To overrule a decision clearly erroneous on principle, is always a duty, even where the Constitution does not interpose; unless there has been a uniform course of corroborating decisions for a series of years, and even then, the principle of *stare decisis* has been most strongly applied in real estate cases. I believe that a single decision has never, in any case, been allowed to stand if found opposed to principle." Citing cases.

In *Harris* v. *Clark*, 2 Barb. 91, 101, the New York Supreme Court held that where it was manifest from the report of a case that it did not receive a deliberate examination, either by counsel or court, they felt themselves at liberty to dispose of the question unembarrassed by a prior decision apparently to the contrary.

In *People* v. *Brooklyn*, 9 Barb. 544, it was said: " We look into these opinions in vain for the evidence of that solemn argument and mature deliberation which, upon the doctrine of *stare decisis*, should give to this case the weight of authority sufficient to foreclose the judgment of all other tribunals upon the same question."

In *Baker* v. *Lorillard*, *supra* (p. 261), the court said: "I go farther, and hold it to be the duty of every judge and every court to examine its own decision and the decisions of other courts without fear, and to revise them without reluctance."

In *Wayne County Savings Bank* v. *Low*, *supra*, the court held that an exceptional, ill-considered and clearly erroneous decision of the court of last resort does not, as a precedent, necessarily control the subsequent determination of a subordinate court of general jurisdiction.

In *Overheiser* v. *Morehouse*, 2 How. Pr. 257, the Special Term of the Supreme Court did not follow a prior decision, saying: " A careful study, however, has so thoroughly convinced the judge, to whom the present case has been submitted, that the decision referred to cannot be upheld, that he has been constrained to follow his own convictions, giving his reasons therefor, thus submitting the problem to the appellate tribunal, whether or not *Miller* v. *Miller* shall be adhered to."

In *Rumsey* v. *N. Y. & N. E. R. R. Co.*, *supra*, the court said (p. 85): " It is no doubt true that even a single adjudication of this court, upon a question properly before it, is not to be questioned or disregarded except for the most cogent reasons, and then only

in a case where it is plain that the judgment was the result of a mistaken view of the condition of the law applicable to the question. But the doctrine of *stare decisis*, like almost every other legal rule, is not without its exceptions. It does not apply to a case where it can be shown that the law has been misunderstood or misapplied, or where the former determination is evidently contrary to reason. The authorities are abundant to show that in such cases it is the duty of courts to re-examine the question."

In *Matter of McGinness*, 13 Misc. Rep. 714, the then surrogate of Westchester county stated that under ordinary circumstances it would be incumbent upon his court to follow the decision of the General Term without further consideration, but as it appeared that the affirmance of the General Term was *pro forma* and without argument, the point stood substantially as if determined by the judge below.

In *People ex rel. Davidson* v. *Williams*, 85 Misc. Rep. 553; affd:, 164 App. Div. 900, the court, sitting at Special Term, said: " My respect for the rule of *stare decisis* and for the learned justices who wrote in the cases referred to would lead me to follow their interpretation of the statute, but we have been recently admonished that the doctrine of *stare decisis* does not relieve a judge of responsibility in a case like this, when no decision has been rendered by the court of last resort, or when no conclusive reason is given for the decision reached," citing *Montrose* v. *Baggott*, 161 App. Div. 494.

Judge Cardozo in his work " The Nature of the Judicial Process," treats of the subject of Adherence to Precedent (p. 142) and quotes with approval from the decision of Wheeler, J., in *Dwy* v. *Connecticut Co.*, 89 Conn. 74, 99, partly as follows: " That court best serves the law which recognizes that the rules of law which grew up in a remote generation may, in the fullness of experience, be found to serve another generation badly, and which discards the old rule when it finds that another rule of law represents what should be according to the established and settled judgment of society, and no considerable property rights have become vested in reliance upon the old rule," and observes that " If judges have woefully misinterpreted the *mores* of their day, or if the *mores* of their day are no longer those of ours, they ought not to tie, in helpless submission, the hands of their successors." See, also, Wells on Doctrines of Res Adjudicata and Stare Decisis, (1878) 527 *et seq.*, and Essay on Doctrine of Stare Decisis, New York State Bar Association Reports, (1885) vol. VIII, 69.

From the foregoing, and an examination of many other cases, I reach the conclusion that when a situation arises where a judge's opinion does conflict with the decision of an appellate court, he

may venture to examine the precedent to ascertain under what circumstances the conclusion enunciated was reached, keeping in mind always, however, that the general rule is adherence to precedent and that non-adherence is an exception permitted only under extraordinary circumstances. If I am correct in this, then I am not bound blindly to follow the principle laid down in *Bradwell* v. *Weeks, supra,* but am permitted to proceed with the examination stated.

The case of *Bradwell* v. *Weeks,* 1 Johns. Ch. 205, was heard by Chancellor Kent over 100 years ago, and by him it was held that an alien enemy may take personal property by succession as next of kin and is entitled to a distributive share under the act for the distribution of intestate estates, though he cannot recover it during the war, under which circumstances it remains in the hands of the administrator in trust for him until the return of peace. The matter was appealed to the Court for the Correction of Errors. One of the judges hearing the case wrote an opinion affirming the decree of the Court of Chancery. The remaining three judges who heard the case declared themselves to be of the same opinion. Seven senators likewise voted for affirmance. Eleven senators voted for reversal. The members of the court were thus evenly divided in opinion, and the president, the lieutenant-governor, declared for reversal, and the decree of the Court of Chancery was thereupon reversed and a direction made that the estate be paid over after the deduction of costs, etc., to the appellants.

It will thus be observed that every judge who heard the cause, and who passed upon the appeal, was of the opinion that enemy aliens resident in the enemy country were entitled to receive their distributive share, subject to the rights of the government pending the war, and the only opinion rendered in the appellate court was read for affirmance. None of the other eleven senators nor the lieutenant-governor who voted for reversal, and whose judgment prevailed, wrote any opinion, or, so far as the record discloses, gave any reason for the votes cast. The case has never been cited in the state of New York, so far as I have been advised or have been able to discover, as an authority for the proposition that alien enemies residing in an enemy country cannot take by bequest, and it appears to be the only case in the court of last resort in this state on the question. It has been cited on several occasions in this state in cases involving other questions, but always apparently on the opinion of the chancellor or upon that of the judge of the appellate court, which did not prevail. *Tanas* v. *Municipal Gas Co.,* 88 App. Div. 251; *Sands* v. *N. Y. Life Insur-*

*ance Co.*, 50 N. Y. 626.   It has also been cited in other states, but strange to say always upon the opinions referred to.   *Seymour* v. *Bailey*, 66 Ill. 288, 301; *Blackwell* v. *Willard*, 65 N. C. 555; *Evans Appeal from Probate*, 51 Conn. 435, 439; *Louisville & Nashville R. R. Co.* v. *Buckner*, 8 Bush (Ky.), 277, 282.

It has never been followed, appears to be entirely contrary to the policy of the government at the time it was rendered as the said policy was interpreted by one of the ablest minds of that period, and it is against the present policy of the government, if I am correct in my conclusions.

Under these circumstances and the others adverted to, which do not indicate that the result was arrived at after examination, consideration and deliberation, or was as Chancellor Kent says " A solemn decision upon a point of law " (1 Kent Com. 475), I am of the opinion that it is not a precedent controlling at this time, and that I am not obliged to follow it, and I, therefore, hold that the enemy aliens referred to are not barred, but are entitled to receive their legacies subject to the rights of the alien property custodian.

The objections are dismissed, with costs to the petitioner payable out of the estate.

Settle decision and decree accordingly.

Decreed accordingly.